Ronald Andrew Mayo and Leslie Archer Mayo,
Petitioners *v*. Commissioner of Internal
Revenue, Respondent

Docket No. 15527–03.          Filed January 25, 2011.

P–H was engaged in the trade or business of gambling on
horse races during 2001. Ps attached a Schedule C, Profit or
Loss From Business, to their 2001 Federal income tax return,
on which they reported the results of P–H's gambling busi-
ness, including gross receipts of $120,463 and expenses of
$142,728, consisting of $131,760 for wagers placed and
$10,968 in expenses incurred in connection with the conduct
of the gambling business. Ps deducted the excess of the
Schedule C expenses over gross receipts, $22,265, as a busi-
ness loss against their other income. R issued a notice of defi-

ciency disallowing $22,265 of Ps' claimed loss from gambling; i.e., the amount by which expenses from P–H's gambling activity exceeded gross receipts from gambling. R contends that Ps' allowable losses from P–H's gambling business are limited to the reported gross receipts from the business pursuant to I.R.C. sec. 165(d). R further maintains that the "Losses from wagering transactions" for purposes of I.R.C. sec. 165(d) include both the $131,760 cost of wagers placed by P–H and the $10,968 in expenses he incurred in connection with the conduct of the gambling business. Finally, R determined that Ps are liable for an accuracy-related penalty under I.R.C. sec. 6662(a) and (b)(2) for a substantial understatement of income tax. *Held*: I.R.C. sec. 165(d) applies to P–H notwithstanding his engagement in the trade or business of gambling and limits his allowable losses from wagering transactions to the extent of gains from such transactions. The holding of *Offutt v. Commissioner*, 16 T.C. 1214 (1951), to that effect followed. *Held*, *further*, trade or business expenses incurred by P–H in the conduct of the trade or business of gambling, other than the cost of wagers, are not subject to the limitation of I.R.C. sec. 165(d) but are instead deductible under I.R.C. sec. 162(a). The holding of *Offutt v. Commissioner*, *supra*, to the contrary will no longer be followed. *Held*, *further*, Ps are not liable for any penalty under I.R.C. sec. 6662(a) and (b)(2).

Ronald Andrew Mayo and Leslie Archer Mayo, pro sese.
*Michael S. Hensley*, for respondent.

GALE, *Judge*: Respondent determined a deficiency of $9,732 in Federal income tax and an accuracy-related penalty under section 6662(a) and (b)(2)[1] of $1,387 with respect to petitioners' 2001 taxable year.[2] Respondent subsequently conceded that petitioner Ronald Andrew Mayo (petitioner)[3] was in the trade or business of gambling during 2001 and allowed petitioner's gambling expenses (which totaled $142,728) to be deducted as trade or business expenses to the extent of his gross receipts from gambling ($120,463). The foregoing concessions resulted in a reduced deficiency and accuracy-

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 as in effect during the taxable year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The foregoing reflected, among other adjustments, respondent's determination that petitioner Ronald Andrew Mayo was not engaged in the trade or business of gambling and was therefore required to claim any gambling losses (but only to the extent of gambling gains) as itemized deductions.

[3] Petitioner Leslie Archer Mayo signed a joint return for the taxable year at issue but had no active involvement in the gambling activity.

related penalty of $6,993 and $1,387, respectively. The issues for decision are:

(1) Whether petitioner's engagement in the trade or business of gambling entitles him to deduct the losses from his gambling business from gross income without regard to section 165(d), which allows wagering losses only to the extent of wagering gains;

(2) whether petitioner is entitled to deduct the expenses, other than the costs of wagers, incurred in carrying on his gambling business pursuant to section 162(a) without regard to section 165(d); and

(3) whether petitioners are liable for an accuracy-related penalty under section 6662(a) and (b)(2) for substantial understatement of income tax.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts and the exhibits attached thereto. [4]

Petitioners resided in California when the petition was filed.

The parties have stipulated that petitioner was engaged in the trade or business of gambling on horse races during 2001. During that year he wagered $131,760 on the outcome of horse races and won $120,463 as a result of the wagers he placed. Petitioners attached a Schedule C, Profit or Loss From Business, to the 2001 Federal income tax return on which they reported the results of petitioner's gambling business. On the Schedule C petitioners reported as gross receipts the $120,463 of proceeds from petitioner's winning wagers and deducted as an expense the $131,760 in wagers petitioner placed (wagering expenses). Petitioners also claimed the following as expenses on the Schedule C (collectively, business expenses):

---

[4] Petitioner reserved relevancy objections to almost all of the stipulations and stipulated exhibits, including portions of the 2001 Federal income tax return, the notice of deficiency issued with respect to 2001, and the Notice CP2000 in which respondent conceded petitioner's status as a professional gambler. We hereby overrule petitioner's relevancy objections. Certain stipulations concerning petitioner's professional education and employment appear germane only to the accuracy-related penalty for substantial understatement of income tax. Since we conclude that there is no substantial understatement of income tax on the 2001 return, these stipulations are not material in any event.

| *Expense* | *Amount* |
|---|---|
| Car and truck | $3,109 |
| Interest | 91 |
| Office | 256 |
| Travel | 776 |
| Meals and entertainment | 1,651 |
| Telephone and Internet | 670 |
| Admission/entry fees | 1,251 |
| Subscriptions | 1,056 |
| Handicapping data | 1,960 |
| ATM fees | 148 |
| Total | 10,968 |

Petitioners deducted the total of the wagering expenses and business expenses ($142,728) from the reported gross receipts from wagering ($120,463), resulting in a reported net loss on the Schedule C of $22,265. This figure was claimed as a business loss, which petitioners deducted from gross income.[5]

On June 9, 2003, respondent sent petitioners a notice of deficiency for 2001 in which he determined that petitioner was not engaged in the trade or business of gambling and was therefore required to claim any gambling losses (but only to the extent of gambling gains) as itemized deductions (pursuant to section 63) and subject to the limitation of section 68, rather than as trade or business expenses under section 62(a)(1). On August 11, 2003, respondent sent petitioners a Notice CP2000 in which he conceded that petitioner was in the trade or business of gambling and that petitioners were therefore entitled to deduct petitioner's wagering expenses and business expenses on Schedule C, but only to the extent of his gross receipts from gambling. Consequently, respondent allowed Schedule C expenses of only $120,463, the amount of gross receipts reported from gambling, thereby eliminating the $22,265 net loss from gambling that petitioners had claimed as a deduction from gross income. Respondent's limitation of petitioners' allowable deductions from gambling to $120,463 effectively disallowed both the excess of the $131,760 in wagering expenses over the $120,463 in gross receipts from gambling ($11,297) and business expenses claimed in connection with the conduct of the gambling business ($10,968).

---

[5] Petitioner's gross income consisted of wages, interest, refunds of State and local income taxes, capital gain, pensions and annuities, royalties, Social Security benefits, and trust fees.

OPINION

I. *Application of Section 165(d) to the Trade or Business of Gambling*

Section 162(a) generally allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Section 165(d), however, provides that "Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions." The parties have stipulated that petitioner was in the trade or business of gambling on horse races in 2001 and that he "wagered" a total of $131,760 on the outcome of horse races and won a total of $120,463 as a result of this wagering during that year. Petitioner's wagering expenses thus come within the description of both section 162(a) and section 165(d). See, e.g., *Boyd v. United States*, 762 F.2d 1369, 1372–1373 (9th Cir. 1985); *Nitzberg v. Commissioner*, 580 F.2d 357, 358 (9th Cir. 1978), revg. T.C. Memo. 1975–154 and T.C. Memo. 1975–228; *Offutt v. Commissioner*, 16 T.C. 1214, 1215 (1951); *Crawford v. Commissioner*, T.C. Memo. 2010–54; *Valenti v. Commissioner*, T.C. Memo. 1994–483.

Petitioner contends that under *Commissioner v. Groetzinger*, 480 U.S. 23 (1987), the limitation of section 165(d) on the deduction of gambling losses does not apply to professional gamblers. Citing the Supreme Court's observation that "basic concepts of fairness * * * demand that * * * [gambling] activity be regarded as a trade or business just as any other readily accepted activity", *id.* at 33, petitioner contends that section 165(d) does not apply to an individual engaged in the trade or business of gambling since it does not apply to other trades or businesses.

In 1951 this Court considered whether an individual engaged in the trade or business of gambling is subject to the section 165(d) limitation on wagering losses, holding that the limitation applied in these circumstances. *Offutt v. Commissioner, supra* at 1215–1216;[6] accord *Skeeles v. United States*, 118 Ct. Cl. 362, 372, 95 F. Supp. 242, 246–247 (1951). In recent years we have repeatedly rejected the claim that

---

[6] *Offutt v. Commissioner*, 16 T.C. 1214 (1951), construed sec. 23(h) of the 1939 Code, a predecessor of current sec. 165(d) with identical language. The language first appeared in the Revenue Act of 1934, ch. 277, sec. 23(g), 48 Stat. 689, and has remained unchanged since.

*Groetzinger* modified this settled law and should be read as confining the application of section 165(d) to casual or recreational gamblers and eliminating the section's limitation on the deduction of the gambling losses of professional gamblers. See *Crawford v. Commissioner*, *supra*; *Lyle v. Commissioner*, T.C. Memo. 1999–184, affd. without published opinion 218 F.3d 744 (5th Cir. 2000); *Valenti v. Commissioner*, *supra*.

In *Valenti* we considered this claim regarding *Groetzinger* at length. We observed that, even though the gambling losses of a professional gambler fall under both the section 162(a) allowance of deductions for trade or business expenses and the section 165(d) limitation on the deduction of losses from wagering, it is a well-settled principle that section 165(d), as the more specific statute, trumps the more general provisions of section 162(a). The former provision operates as a limitation on deductions otherwise allowable under the latter. See *Nitzberg v. Commissioner*, *supra* at 358; see also *Boyd v. United States*, *supra* at 1372–1373; *Skeeles v. United States*, *supra* at 247.

Moreover, we reasoned, the Supreme Court in *Groetzinger* did not consider the interplay between sections 162(a) and 165(d) because the restriction in section 165(d) was not at issue in that case. Instead, the issue decided in *Groetzinger* was whether the taxpayer's gambling activities constituted engagement in a trade or business under section 162 "*for purposes of treating his gambling losses as a tax preference item under the minimum tax scheme governed by sections 55 and 56.*" *Valenti v. Commissioner*, *supra*. In *Groetzinger* the Supreme Court held that an individual engaged in gambling for his own account—that is, not providing goods or services to others as would a casino operator or bookmaker—is engaged in a trade or business within the meaning of sections 62(a)(1) and 162(a), with the result that his gambling losses were not items of tax preference for purposes of the then-applicable alternative minimum tax. As for the suggestion that *Groetzinger*'s holding regarding the trade or business status of certain individual gamblers eliminated the section 165(d) limitation in the case of professional gamblers, we noted in *Valenti* the consistent line of cases holding the section 165(d) limitation applicable even where wagering activities were conducted as a trade or business, citing *Boyd v. United States*, *supra*, *Estate of Todisco v. Commissioner*, 757

F.2d 1, 6–7 (1st Cir. 1985), affg. in part and vacating in part T.C. Memo. 1983–247, *Nitzberg v. Commissioner*, *supra*,[7] *Skeeles v. United States*, *supra*, *Offutt v. Commissioner*, *supra*, *Ward v. Commissioner*, T.C. Memo. 1986–237, and *Kozma v. Commissioner*, T.C. Memo. 1986–177.[8] See also *Lyle v. Commissioner*, *supra*. The section 165(d) limitation has been applied whether the professional gambler was an individual wagering for his own account, see *Boyd v. United States*, 762 F.2d 1369 (9th Cir. 1985); *Crawford v. Commissioner*, *supra*; *Tschetschot v. Commissioner*, T.C. Memo. 2007–38; *Praytor v. Commissioner*, T.C. Memo. 2000–282; *Lyle v. Commissioner, supra*; *Kochevar v. Commissioner*, T.C. Memo. 1995–607; *Kozma v. United States*, *supra*, an individual or partnership engaged in providing gambling services to others, see *Estate of Todisco v. Commissioner*, *supra*; *Nitzberg v. Commissioner, supra*; *Ward v. Commissioner*, *supra*, or an individual engaged in both, see *Skeeles v. United States*, *supra*; *Offutt v. Commissioner*, *supra*.

In *Commissioner v. Groetzinger*, *supra* at 32, the Supreme Court made the following observations regarding section 165(d):

Federal * * * legislation * * * [has] been reluctant to treat gambling on a parity with more "legitimate" means of making a living. * * * And the confinement of gambling-loss deductions to the amount of gambling gains, a provision brought into the income tax law as § 23(g) of the Revenue Act of 1934 * * * and carried forward into § 165(d) of the 1954 Code, closed the door on suspected abuses * * * but served partially to differentiate genuine gambling losses from many other types of adverse financial consequences sustained during the tax year. * * *

---

[7] Although *Nitzberg v. Commissioner*, 580 F.2d 357 (9th Cir. 1978), revg. T.C. Memo. 1978–154 and T.C. Memo. 1978–228, reversed two Memorandum Opinions of this Court, the reversal turned upon different views concerning whether the wagering transactions at issue were those of the taxpayers or third parties and not upon a different view of the applicability of sec. 165(d) to wagering activities conducted as a trade or business.

[8] We acknowledge that the Court of Appeals for the Ninth Circuit, to which an appeal would lie, has voiced some doubts regarding this line of authority. In *Kent v. United States*, 185 F.3d 867 (9th Cir. 1999), an unpublished opinion, the Court of Appeals stated that its decisions in *Nitzberg v. Commissioner*, *supra*, and *Boyd v. United States*, 762 F.2d 1369 (9th Cir. 1985), "clearly hold that § 165(d) limits the deduction of gambling losses even of those who gamble professionally." However, the Court of Appeals went on to note:

It is true that the U.S. Supreme Court's 1987 decision in *Commissioner v. Groetzinger* * * * casts some doubt on the continued vitality of the reasoning of *Nitzberg* and *Boyd*, but it did not overrule those decisions. Like the district court, a three-judge panel of this court is bound by our precedents. If *Nitzberg* and *Boyd* are not to be followed any longer, the court sitting en banc must overrule them. * * * [*Kent v. United States*, *supra*.]

Thus, contrary to petitioner's contention, the Supreme Court *acknowledged* the congressional decision to treat gambling losses differently from other losses for purposes of the Federal income tax, even when incurred as a "means of making a living". This passage cannot be readily reconciled with petitioner's contention that *Commissioner v. Groetzinger*, 480 U.S. 23 (1987), removed the section 165(d) limitation on losses from wagering transactions when incurred in the conduct of a trade or business.

The legislative history of the enactment of the Revenue Act of 1934 (1934 Act), ch. 277, sec. 23(g), 48 Stat. 689, the predecessor of section 165(d), also supports the conclusion that the limitation on losses from wagering transactions was intended to apply to all such losses, even if incurred in the conduct of a trade or business. Before enactment of 1934 Act sec. 23(g), there was no statutory provision specifically directed at wagering losses. The courts had determined the deductibility of losses from gambling on the basis of the predecessors of section 165(c)(2) that allowed deductions for losses incurred in any transaction entered into for profit, though not connected with a trade or business. [9] Caselaw and administrative rulings before enactment of 1934 Act sec. 23(g) held that the deductibility of gambling losses depended upon whether the gambling was illegal or legal and whether it was undertaken for profit rather than merely for recreation. Losses from illegal gambling were deductible only to the extent of gains therefrom. *Frey v. Commissioner*, 1 B.T.A. 338 (1925). [10] Losses from legal gambling were fully deductible against other types of income if the gambling had been entered into for profit, see G.C.M. 10873, 1932–2 C.B. 85; see also *Cronan v. Commissioner*, 33 B.T.A. 668 (1935) (construing law before enactment of 1934 Act sec. 23(g) as allowing deduction of losses from legal gambling against nongambling income), and not deductible at all if the gambling had not been entered into for profit, *Beaumont v. Commis-*

---

[9] See Revenue Act of 1932, ch. 209, sec. 23(e)(2), 47 Stat. 180; Revenue Act of 1928, ch. 852, sec. 23(e)(2), 45 Stat. 800; Revenue Act of 1926, ch. 27, sec. 214(a)(5), 44 Stat. 26; Revenue Act of 1918, ch. 18, sec. 214(a)(5), 40 Stat. 1067 (1919) (allowing deductions for losses incurred in any transaction entered into for profit, though not connected with the trade or business).

[10] The Board of Tax Appeals reasoned in *Frey v. Commissioner*, 1 B.T.A. 338, 340–341 (1925), that a loss from illegal gambling had not been "incurred" in any transaction entered into for profit (within the meaning of sec. 214(a)(5) of the Revenue Act of 1918) because the liability underlying the loss was not legally enforceable.

*sioner*, 25 B.T.A. 474 (1932), affd. 73 F.2d 110 (D.C. Cir. 1934).

Against this backdrop, Congress decided in the 1934 Act that the unlimited deduction for legal, profit-motivated gambling was inappropriate. Instead, Congress determined that the judicially developed rule for illegal gambling, which limited losses to gains, should be extended to legal gambling. The report of the Committee on Ways and Means explained:

Section 23(g). Wagering losses: Existing law does not limit the deduction of losses from gambling transactions where such transactions are legal. Under the interpretation of the courts, illegal gambling losses can only be taken to the extent of the gains on such transactions. A similar limitation on losses from legalized gambling is provided for in the bill. * * * [H. Rept. 704, 73d Cong., 2d Sess. 22 (1934), 1939–1 C.B. (Part 2) 554, 570.]

See also S. Rept. 558, 73d Cong., 2d Sess. 25 (1934), 1939–1 C.B. (Part 2) 586, 605 (to same effect). Since existing law at the time of enactment of the 1934 Act allowed losses to be deducted in excess of gains only in the case of gambling entered into for profit, see *Beaumont v. Commissioner*, *supra*, the limitation on losses in the 1934 Act was directed at profit-motivated gambling only.[11] As noted, 1934 Act sec. 23(g) survives unchanged as section 165(d). Section 165(d) was therefore from its inception intended to apply to profit-motivated gambling. While caselaw at the time of enactment of the 1934 Act had not addressed gambling rising to the level of a trade or business as opposed to gambling constituting a transaction entered into for profit, Congress' clear intention to limit losses for profit-motivated gambling makes doubtful any claim that Congress did not intend the section 165(d) limitation to apply to gambling conducted as a trade or business. See also *Skeeles v. United States*, 118 Ct. Cl. at 370–371, 95 F. Supp. at 245–246 (to same effect); *Offutt v. Commissioner*, 16 T.C. at 1215 (finding no basis for distinguishing gambling conducted as a trade or business from gambling constituting a transaction entered into for profit for purposes of the section 165(d) limitation on wagering losses).

---

[11] Only later was the language of sec. 165(d)—to the effect that losses from wagering transactions "shall be allowed"—interpreted as a *liberalizing* measure in the case of recreational gamblers, entitling them to deduct gambling losses to the extent of gambling gains without regard to profit motive. See *Humphrey v. Commissioner*, 162 F.2d 853, 855 (5th Cir. 1947), affg. in part and revg. in part a Memorandum Opinion of this Court; see also *Winkler v. United States*, 230 F.2d 766, 774 (1st Cir. 1956).

On the basis of the reasoning of *Valenti v. Commissioner*, T.C. Memo. 1994–483, and the additional reasons discussed above, we reject petitioner's contention that *Commissioner v. Groetzinger*, *supra*, requires a holding that the section 165(d) limitation on losses from wagering transactions does not apply to persons engaged in the trade or business of gambling. Instead, following *Offutt v. Commissioner*, 16 T.C. 1214 (1951), we hold that petitioner's wagering expenses of $131,760 constitute losses from wagering transactions that are limited by section 165(d) to the gains he reported from wagering ($120,463), notwithstanding petitioner's engagement in the trade or business of gambling. Accordingly, respondent disallowance of $11,297 of petitioner's claimed loss is sustained.

## II. *Definition of "Losses from wagering transactions"*

We must now decide whether the section 165(d) limitation on "Losses from wagering transactions" is confined to petitioner's wagering expenses or extends to his business expenses, as the parties dispute the point. An implicit holding in *Offutt* is that a professional gambler's "Losses from wagering transactions" for purposes of section 165(d) include amounts expended on wagers as well as other expenses incurred in carrying on the trade or business of gambling. Respondent, relying on *Offutt v. Commissioner, supra*, and *Estate of Todisco v. Commissioner*, 757 F.2d 1 (1st Cir. 1985), contends that "Losses from wagering transactions" covers both, so that petitioner may not deduct either the $11,297 excess of his wagering expenses over gambling gross receipts or the $10,968 in business expenses he claimed in connection with carrying on his gambling business.[12] *Offutt* and *Estate of Todisco* held that section 165(d) limits amounts expended on wagers as well as other expenses incurred in carrying on the trade or business of gambling, such as a bookmaker's mailing, printing, and stenographic expenses (*Offutt*), or his State taxes on wagering (*Estate of Todisco*). Petitioner, while acknowledging *Offutt*, again argues that the subsequent opinion in *Groetzinger* requires a different result; i.e., that the expenses of carrying on his

---

[12] Respondent has not contended that the business expenses claimed are not "ordinary and necessary" expenses of petitioner's trade or business within the meaning of sec. 162(a) or that they have not been substantiated.

gambling business (other than direct wagering expenses) are deductible under section 162(a) without regard to section 165(d).

Neither the statute nor the regulations provide any definition of "Losses from wagering transactions" as used in section 165(d). The legislative history also provides no insight, as it does not address this specific point. *Offutt* offered no reasoning to support the conclusion that "Losses from wagering transactions" should be interpreted to cover both the cost of losing wagers as well as the more general expenses incurred in the conduct of a gambling business. Although *Offutt*'s interpretation of "Losses from wagering transactions" has generally been followed by this Court in the 60 years since the case was decided, see *Praytor v. Commissioner*, T.C. Memo. 2000–282; *Kochevar v. Commissioner*, T.C. Memo. 1995–607; *Kozma v. Commissioner*, T.C. Memo. 1986–177; [13] but see *Meredith v. Commissioner,* T.C. Memo. 1984–651 (allowing deduction of professional gambler's transportation expense where wagering losses exceeded gains), no Court of Appeals other than that for the First Circuit in *Estate of Todisco* has had occasion to directly address it. For the reasons discussed below, we conclude that reconsideration of *Offutt*'s interpretation of "Losses from wagering transactions" is warranted and that it should no longer be followed.

While no Court of Appeals other than that for the First Circuit has directly addressed whether "Losses from wagering transactions" as used in section 165(d) encompass the business expenses of a professional gambler, various Courts of Appeals and this Court have considered the other side of the section 165(d) equation—"gains from such transactions"—and construed that phrase quite narrowly. The Courts of Appeals for the Fifth and Ninth Circuits and this Court have rejected arguments for an expansive reading of gains from wagering transactions and confined the phrase to the proceeds from a wager by the taxpayer where the taxpayer stands to gain or lose on the basis of chance. See *Boyd*

[13] We have expressed some subsequent doubts, however, whether the *Offutt* holding concerning the nonwagering business expenses of gambling is correct. See *Kozma v. Commissioner*, T.C. Memo. 1986–177 n.4 (quoting, with reference to the *Offutt* precedent, Justice Brandeis in *Di Santo v. Pennsylvania*, 273 U.S. 34, 42 (1927) ("It is usually more important that a rule of law be settled, than that it be settled right.")).

*v. United States*, 762 F.2d 1369 (9th Cir. 1985); *Allen v. U.S. Govt. Dept. of Treasury*, 976 F.2d 975 (5th Cir. 1992); *Bevers v. Commissioner*, 26 T.C. 1218 (1956); see also *Williams v. Commissioner*, T.C. Memo. 1980–494. But see *Libutti v. Commissioner*, T.C. Memo. 1996–108.

In *Boyd v. United States*, *supra*, the Court of Appeals for the Ninth Circuit, in addition to finding that professional gambler Boyd's losses from poker played as a casino employee to attract customers were losses from wagering transactions limited by section 165(d), was also faced with Boyd's claim that his share of the casino's "take-off" from poker games conducted on the premises constituted gains from wagering transactions for purposes of section 165(d). Take-off was the fee the house charged card players for playing poker in the casino, computed either hourly or as a share of each pot, and Boyd was paid pursuant to his employment contract a portion of the take-off from the poker games in which he participated.

Finding no statutory or regulatory definition of "gains from wagering transactions", the Court of Appeals reasoned that the words should be given their "ordinary meaning." *Boyd v. United States*, *supra* at 1373. The court summarized the parties' arguments and its conclusion as follows:

The IRS argues that the phrase means gain from a wagering transaction entered into by the taxpayer. Boyd argues that it means gain flowing to the taxpayer from a wagering transaction, whether as a participant or as the house taking a table rental. While there is no controlling authority, the IRS position is more persuasive. [*Id.*]

The Court of Appeals found persuasive this Court's opinion in *Williams v. Commissioner*, *supra*, wherein we held that "tokes" given to blackjack dealers by players were not the dealers' gains from wagering transactions eligible to be offset by wagering losses. Tokes are chips placed as a separate bet by a blackjack player *for* the dealer. If the player's hand wins, the winnings from the separate toke bet are given to the dealer. The dealer-taxpayers in *Williams* argued that their toke income constituted gambling winnings that could be offset by gambling losses. We rejected that claim, because the toke bet, under casino policy and State law, remained under the control of the player until the winnings, if any,

were given to the dealer.[14] Thus, we concluded, it was the player, not the dealer, who had entered into a wagering transaction, and any gain received by the dealer in connection with the transaction was not gain from a wagering transaction. The Court of Appeals in *Boyd* adopted our reasoning in *Williams* in holding that Boyd's share of take-off income was not gain from a wagering transaction. While Boyd had contended that the take-off income was gain from a wagering transaction because it had "[flowed] to * * * [him] from a wagering transaction", the Court of Appeals concluded that the take-off income was not gain from a wagering transaction because it was not the result of a wager Boyd had entered. *Boyd v. United States*, *supra* at 1373.

In *Allen v. U.S. Govt. Dept. of Treasury*, *supra*, the Court of Appeals for the Fifth Circuit reached the same result, on similar reasoning, as we reached in *Williams* regarding a blackjack dealer's toke income. The Court of Appeals reasoned that since the dealer "has no part in deciding to make the wager, and stands to lose nothing by it", he does not have gain from a wagering transaction as contemplated in section 165(d) when he receives the winning proceeds from a toke bet made on his behalf. *Id.* at 976–977; see also *Collins v. Commissioner*, 3 F.3d 625, 631 (2d Cir. 1993) (taxpayer who stole racing tickets that generated net gambling losses had theft income, not gain from wagering transactions under section 165(d)), affg. T.C. Memo. 1992–478.

In sum, to the extent this Court and the Courts of Appeals have considered the question, they have generally held that "gains" from "wagering transactions" within the meaning of section 165(d) must be the actual product of wagers entered by the taxpayer. Generally, it is not sufficient that the gain arise merely *in connection with* the conduct of wagering activities; the gain must be the direct result of a wager entered by the taxpayer.[15] By contrast, the holding in *Offutt v. Commissioner*, 16 T.C. 1214 (1951), is that "Losses from wagering transactions" extends to expenses incurred in

---

[14] We noted that, for example, the dealer was not free to take the "toke" chip before the cards were played, and a player was free to take back a winning bet he had placed for a dealer.

[15] An exception is this Court's Memorandum Opinion in *Libutti v. Commissioner*, T.C. Memo. 1996–108, which held that complimentary goods and services provided to the taxpayer by a casino to induce gambling are gains from wagering for purposes of sec. 165(d). We nonetheless emphasized that the nexus of the "comps" to the placement of wagers was "close, direct, evident, and strong."

connection with the conduct of a wagering activity, such as a bookmaker's mailing, printing, and stenographic expenses, even though such expenses are not the direct result of a wager by the taxpayer. Take-off and toke gains from card games have an equally close, if not closer, nexus to wagering transactions as do the mailing, printing, and stenographic expenses of a bookmaker. Yet the latter are treated as "from" wagering transactions in *Offutt* and its progeny when the issue is what constitutes a loss, while the former are not treated as "from" wagering transactions by this and other courts when determining what constitutes a gain. Section 165(d) by its terms applies to losses and to gains "from" wagering transactions. The use of different principles for determining what constitutes a gain versus a loss "from" a wagering transaction finds no support in the statute.

The narrower interpretation that has been applied to gains from wagering transactions, requiring that they be the result of a wager entered by the taxpayer, more closely reflects the ordinary meaning of the words used in the statute, which is the applicable standard. See *Crane v. Commissioner*, 331 U.S. 1, 6 (1947); *Old Colony R.R. Co. v. Commissioner*, 284 U.S. 552, 560 (1932). *Offutt*'s more expansive interpretation of "Losses from wagering transactions" as covering expenses that are not the result of the taxpayer's wager goes beyond the ordinary meaning of the statutory phrase.

In addition, the Supreme Court's opinion in *Commissioner v. Sullivan*, 356 U.S. 27 (1958), decided 7 years after *Offutt*, casts some doubt on the treatment of a professional gambler's nonwagering business expenses as creating a loss from a wagering transaction limited by section 165(d). *Sullivan* concerned the deductibility of the wage and rental expenses of the partners in an illegal bookmaking operation. The Tax Court had held that deductions for these expenditures were not allowable because the expenditures were illegal. The Court of Appeals reversed our decision, and the Supreme Court affirmed the decision of the Court of Appeals, holding that the bookmaking operation's expenditures for wages and rent were ordinary and necessary business expenses deductible under section 162(a).

The amounts paid as wages to employees and to the landlord as rent are 'ordinary and necessary expenses' in the accepted meaning of the words.

*That is enough to permit the deduction*, unless it is clear that the allowance is a device to avoid the consequence of violations of a law * * * or otherwise contravenes the federal policy expressed in a statute or regulation * * * . [*Id.* at 29; emphasis added.]

Absent from the Supreme Court's analysis was any reference to the section 165(d) limitation on wagering losses which, under the reasoning of *Offutt*, would be applicable to wages and rent incurred in conducting a bookmaking business.[16] While, as indicated in the lower court opinions, the taxpayers in *Sullivan* had sufficient wagering gains so that section 165(d) would not have operated to limit the deduction of wage and rent expenses, the absence of any analysis to establish this point suggests that the Supreme Court did not consider section 165(d) to apply to a gambling business' expenses of this nature.

Moreover, the Court of Appeals for the Ninth Circuit, while not expressly holding that the section 165(d) limitation is confined to direct wagering expenses, has nonetheless employed reasoning which strongly implies as much. In *Boyd v. United States*, 762 F.2d 1369 (9th Cir. 1985), Boyd had also sought to deduct as business expenses under section 162(a) his tipping expenses and the take-off fees he paid in order to play poker at the casino. *Boyd* was a refund proceeding, and the Court of Appeals held that Boyd was not entitled to raise his claim for deductions for the tipping and take-off fees because he had not sufficiently identified these grounds in his refund claim filed with the Secretary, as required by the regulations under section 7422(a). The Court of Appeals distinguished between wagering losses and "expenses incidental to gambling", observing that the latter "would not be subject to the section 165(d) deduction limit." *Id.* at 1372. The Court of Appeals reasoned as follows:

In his claim, Boyd stated that he "incurred losses from participating in the [casino] poker games" and that "[t]his expense" was deductible under section 162(a). "This expense" plainly refers to the poker losses, and nowhere does the claim mention tipping or take-off fees. Taken at its face value, Boyd's claim directed the IRS' attention to losses incurred betting on poker hands, and nothing else. Moreover, the wording of Boyd's alternative theory strengthens this impression. It refers to section 165(d), which provides that wagering losses may be deducted only up to the

---

[16]The taxpayer in *Offutt v. Commissioner*, 16 T.C. 1214 (1951), was engaged in both bookmaking and gambling for his own account.

amount of wagering gains, reinforcing by implication the claim's express statement that the losses for which deduction was sought were actual wagering losses, *not other unspecified expenses incidental to gambling which would not be subject to the section 165(d) deduction limit*. [*Id.*; fn. ref. omitted; emphasis added.]

If the Court of Appeals had thought that Boyd's tipping and take-off fees were simply a component of losses from wagering transactions to which the section 165(d) limitation applied, then distinguishing them from Boyd's "poker losses" would not have been necessary. Since Boyd's poker losses exceeded his wagering gains, the tipping and take-off fees clearly would have been nondeductible because they were likewise in excess of wagering gains. Instead, the Court of Appeals distinguished the tipping and take-off fees as raising different legal issues than the poker losses.[17] As a consequence, Boyd's failure to adequately identify these other issues in his administrative refund claim precluded the tipping and take-off fees from being raised in the refund suit. A necessary premise of the Court of Appeals' holding is that the tipping and take-off fees did not necessarily constitute "Losses from wagering transactions" within the meaning of section 165(d).

Finally, the Commissioner has applied the holding in *Offutt v. Commissioner*, 16 T.C. 1214 (1951), regarding the treatment of nonwagering expenses inconsistently. Since *Offutt*, the Commissioner has successfully maintained in many cases that the nonwagering business expenses of a professional gambler are limited by section 165(d), see *Estate of Todisco v. Commissioner*, 757 F.2d at 6–7; *Praytor v. Commissioner*, T.C. Memo. 2000–282; *Kochevar v. Commissioner*, T.C. Memo. 1995–607; *Kozma v. Commissioner*, T.C. Memo. 1986–177, while in other cases he has conceded their deductibility notwithstanding section 165(d), see *Crawford v. Commissioner*, T.C. Memo. 2010–54; *Tschetschot v. Commissioner*, T.C. Memo. 2007–38,[18] or failed to assert the section 165(d) limitation on expenses of this type, see *Meredith v.*

---

[17] The Court of Appeals noted, for example, that lavish tipping might raise the issue of whether it was an "ordinary and necessary" business expense within the meaning of sec. 162(a), and that take-off fees raised the issue of whether they should be construed as a component of a wager's cost rather than a business expense.

[18] See also *Orr v. Commissioner*, T.C. Summary Opinion 2010–55. We do not cite *Orr* as precedent, see sec. 7463(b), but merely to document the Commissioner's concession in that case that gambling-related travel expenses of a professional gambler were deductible notwithstanding sec. 165(d).

*Commissioner*, T.C. Memo. 1984–651. After respondent had taken the position in this case that petitioner's business expenses were limited by section 165(d), the Internal Revenue Service announced that it would no longer follow *Offutt* or *Estate of Todisco*. See IRS Chief Counsel Attorney Memorandum, AM2008–013 (Dec. 19, 2008). However, our failure to address *Offutt* may invite further administrative inconsistency concerning a professional gambler's entitlement to deductions under section 162(a) for the nonwagering trade or business expenses of engaging in gambling. [19]

For the foregoing reasons, we conclude that the holding in *Offutt v. Commissioner*, *supra*, that "Losses from wagering transactions" include the trade or business expenses of a professional gambler other than the costs of wagers, should no longer be followed. We accordingly hold that petitioner is entitled to deduct under section 162(a) the $10,968 in business expenses claimed in connection with carrying on his gambling business. [20]

## III. *Accuracy-Related Penalty*

Respondent determined that petitioners are liable for an accuracy-related penalty under section 6662(a) and (b)(2) for a substantial understatement of income tax on their 2001 Federal income tax return. Respondent's determination was premised upon the disallowance of both the $11,297 excess of wagering expenses over gross receipts from wagering and the $10,968 in business expenses not part of the costs of wagers. Since we have sustained respondent only with respect to the former, the resulting understatement would not be a substantial understatement of income tax as defined in section 6662(d). Accordingly, respondent's determination as to the section 6662(a) and (b)(2) accuracy-related penalty is not sustained.

To reflect the foregoing,

> *Decision will be entered under Rule 155.*

Reviewed by the Court.

---

[19] Moreover, respondent's reliance on *Offutt* in this case to deny petitioner's business expenses incurred in gambling would result in an addition to tax for substantial understatement of income tax if respondent's position were upheld.

[20] Respondent has not argued that any of petitioner's claimed business expenses were so integral to his wagers that they should be treated as part of the wagers' cost. We leave any such issue for another day.

COLVIN, COHEN, THORNTON, MARVEL, GOEKE, WHERRY, KROUPA, HOLMES, GUSTAFSON, PARIS, and MORRISON, *JJ*., agree with this opinion.

———————

HALPERN, *J*., concurring: I agree with the result reached by the majority and write separately only to question the vitality of our Memorandum Opinion in *Libutti v. Commissioner*, T.C. Memo. 1996–108, in which we held that $2.5 million in comps (including free cars and European vacations) that the taxpayer received from an Atlantic City casino are "gains from * * * [wagering] transactions" for purposes of section 165(d). The majority describes *Libutti* as an "exception" to the general rule that "'gains' from 'wagering transactions' within the meaning of section 165(d) must be the actual product of wagers entered by the taxpayer." Majority op. p. 93 and note 15. The majority reports that in *Libutti* we emphasized that the nexus of the "comps" to the taxpayer's wagering was "'close, direct, evident, and strong.'" Majority op. note 15. Before that statement in *Libutti*, however, we stated: "Although petitioner's receipt of the comps did not directly hinge on the success or failure of his wagers, he received the comps *incident to* his direct participation in wagering transactions." (Emphasis added.) Compare that statement to what we say today: "Generally, it is not sufficient that the gain arise merely *in connection with* the conduct of wagering activities; the gain must be the direct result of a wager entered by the taxpayer." Majority op. p. 93. Whether there is any material difference between "incident to" and "in connection with" remains to be seen. And whether the *Libutti* result can survive as an exception to the general rule in the light of our analysis herein also remains to be seen.

GOEKE and HOLMES, *JJ*., agree with this concurring opinion.