142 T.C. No. 8

UNITED STATES TAX COURT

SHIRAZ NOORMOHAMED LAKHANI, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

SHIRAZ LAKHANI, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 21212-10, 24563-11.[1]          Filed March 11, 2014.

For 2005-09, P, a professional gambler who bet on horse races, deducted his net wagering losses (either incurred during the year or carried over from prior years) in contravention of I.R.C. sec. 165(d). R disallowed those deductions and imposed an I.R.C. sec. 6662(a) accuracy-related penalty for all years. P argues (1) he is entitled to deductions for pro rata shares of the track's "takeout" from the parimutuel betting pools, which would wholly or partially offset the disallowed net wagering losses for the years at issue and (2) I.R.C.

---

[1]Petitioner filed a petition with respect to 2005 and 2006 (docket No. 21212-10) in the name of Shiraz Noormohamed Lakhani and a petition with respect to 2007-09 (docket No. 24563-11) in the name of Shiraz Lakhani. The cases were consolidated by order of this Court dated August 17, 2012.

sec. 165(d) unreasonably discriminates against business losses of professional gamblers and constitutes a violation of their constitutional right to the equal protection of the laws.  With respect to R's imposition of the I.R.C. sec. 6662(a) penalty, P argues he acted with reasonable cause and in good faith in deducting his net wagering losses for the years at issue.

      1.  <u>Held</u>:  Because "takeout" represents the track's share of a parimutuel betting pool and the expenses discharged therefrom are obligations imposed on the track, not the bettors, P is not entitled to deduct a pro rata share of all or any portion thereof.

      2.  <u>Held</u>, <u>further</u>, applying the I.R.C. sec. 165(d) limitation on the deductibility of wagering losses to the wagering losses of a professional gambler is not an unconstitutional violation of the Equal Protection Clause.

      3.  <u>Held</u>, <u>further</u>, the I.R.C. sec. 6662(a) accuracy-related penalty is sustained for all years.

Shiraz Noormohamed Lakhani, pro se.

<u>Nathan C. Johnston</u> and <u>Linette B. Angelastro</u>, for respondent.

HALPERN, <u>Judge</u>:  By notices of deficiency (notices), respondent determined deficiencies in income tax and penalties for petitioner's 2005-09 calendar taxable years as follows:

| Year | Deficiency | Penalty sec. 6662 |
|------|------------|-------------------|
| 2005 | $22,571 | $4,514 |
| 2006 | 18,462 | 3,692 |
| 2007 | 9,918 | 1,984 |
| 2008 | 7,401 | 1,480 |
| 2009 | 5,965 | 1,193 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

After concessions, the issues for decision are whether petitioner, a professional gambler, is, for the years at issue, (1) entitled to a deduction for his losses from wagering transactions in excess of his gains from such transactions (whether those net losses were incurred during the taxable year or used by means of a net operating loss carryover) and (2) liable for the section 6662 accuracy-related penalty.[2]

---

[2]There are also certain computational adjustments that follow from the adjustments at issue, but they are not in controversy, and we need not discuss them.

## FINDINGS OF FACT[3]

Some facts are stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference.

At the time the petition was filed, petitioner resided in Woodland Hills, California.

For each of the years at issue, petitioner, a certified public accountant, maintained an accounting practice, which included the preparation of tax returns for clients. He reported the income and expenses from his accounting practice on a Form 1040, U.S. Individual Income Tax Return, Schedule C, Profit or Loss From Business. During those years, petitioner was also a professional gambler whose gambling activities were limited to parimutuel wagering on horse races. To that end, petitioner placed bets on races occurring both at California racetracks and at racetracks in other States. He reported the results from his wagering on a separate Schedule C (gambling Schedule C) for each of the years at issue. On each of the gambling Schedules C, petitioner reported the gross amount he received on

---

[3]Petitioner in his answering brief has not made reference by number to those findings of fact proposed by respondent to which he objects, as required by Rule 151(e)(3). We, therefore, deem petitioner to have conceded the accuracy of respondent's proposed findings of fact with respect to which we discern he raises no objection in his answering brief, except to the extent that his own proposed findings of fact are inconsistent therewith. See Jonson v. Commissioner, 118 T.C. 106, 108 n.4 (2002), aff'd, 353 F.3d 1181 (10th Cir. 2003).

(winning) bets as "Gross receipts or sales", and he reported the amounts he had bet as "Cost of goods sold", subtracting the latter from the former, to determine his gross income or his loss from gambling. He also reported and deducted miscellaneous other expenses associated with his gambling activities[4] and reported the sum of his gambling winnings, losses, and miscellaneous other expenses as his income or loss (net wagering income or loss, respectively) from gambling for the year. He then combined his net wagering income or loss with his accounting practice income for the year and reported the sum of the two on page 1, line 12 of his Form 1040 as his total net "Business income or (loss)" for the year.

For each of 2005, 2006, 2008, and 2009 (gambling loss years), petitioner's net wagering loss exceeded his accounting practice income, so that line 12 of each Form 1040 reported a business loss. For 2007, in which he reported a net wagering gain, and for 2009, petitioner claimed net operating loss carryover deductions all or a portion of which, presumably, arose out of unused net wagering losses incurred in prior years. Among respondent's adjustments for each of the gambling loss years is the disallowance of petitioner's deduction for his net

---

[4]Although the miscellaneous other expenses petitioner deducted for 2005 and 2006 are treated as nondeductible in the notice covering those years, respondent now concedes their deductibility on the grounds that they constitute deductible nonwagering business expenses of a professional gambler. See Mayo v. Commissioner, 136 T.C. 81, 97 (2011).

wagering losses on the basis of section 165(d), which provides: "Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions."[5] Respondent also disallowed the net operating loss carryovers to 2007 and 2009.

## OPINION

I.      Deductibility of Petitioner's Net Wagering Losses

A.      Parties' Arguments

1.      Petitioner's Arguments

Petitioner bases his argument that he is entitled to deduct his wagering losses in excess of his wagering gains under sections 162(a) (as ordinary and necessary business expenses), 165(a) (as losses), and/or 212(1) (as expenses for the production of income) on two alternative grounds. One, for each of the parimutuel bets that he made he is entitled to deduct that portion of the bet equal

---

[5]Petitioner's disallowed net wagering losses for the gambling loss years were as follows:

| Year | Amount |
|------|--------|
| 2005 | $81,793 |
| 2006 | 110,196 |
| 2008 | 60,454 |
| 2009 | 36,240 |

to the takeout percentage that applies to the parimutuel pool formed to receive that bet. Two, section 165(d) is inapplicable to professional gamblers. We will address those arguments in turn.

### a. Deductibility of Takeout

Before addressing petitioner's arguments, we will describe the concepts of parimutuel wagering and takeout.[6]

In parimutuel wagering, applicable to, among other events of chance, betting on horse races, the entire amount wagered is referred to as the betting pool or "handle". The pool can be managed to ensure that the event manager (in horse racing, the track) receives a share of the betting pool regardless of who wins a particular event or race. That share is referred to as the takeout, and the percentage, set by State law, varies from State to State, generally ranging from

---

[6]It is interesting to note that the nature of parimutuel betting came before our predecessor, the Board of Tax Appeals, in its first year. See McKenna v. Commissioner, 1 B.T.A. 326, 332 (1925), in which we stated:

> The question before us resolves itself to this: What was the actual gain resulting to the taxpayer from his handbook operations? In the pari mutuel system of wagering on horse racing the odds are fixed after the race is won. All the money bet forms a pool out of which payments of a fixed percentage are made to the State and to the licensed commission under whose auspices the races are run, the residue being apportioned to the bettors. Thus the track odds determined. * * *

15% to 25% and often depending upon the type of bet, e.g., "straight" or "conventional" win, place, or show wagers or "exotic" (multiple horse or multiple race) wagers, the latter usually resulting in higher takeout percentages.[7] The takeout is used to defray the track's expenses, including purse money for the horse owners, taxes, license fees, and other State-mandated amounts. What remains from the takeout after those liabilities are provided for constitutes the track's profits. The takeout may also be used to cover any shortfall in the amount available in the parimutuel pool, after reduction for takeout, to pay off the winning bettors. That circumstance, generally referred to as the creation of a "minus pool", arises by virtue of the requirement, in many States, that the track provide a minimum profit to winning ticket holders. See, e.g., California Horse Racing Board Rule 1960, which provides, in pertinent part, as follows: "The association must pay to the holder of any * * * [winning ticket or tickets] the amount wagered * * * plus a minimum of 5% thereof. This requirement is unaffected by the existence of a parimutuel pool which does not contain sufficient money to distribute said 5% to all persons holding such tickets." Thus, on those presumably

---

[7]The various types of straight or conventional wagers (i.e., bets to win, place, or show) and exotic wagers (e.g., exacta, quinella, and trifecta bets) each form separate and distinct parimutuel betting pools. See, e.g., Cal. Bus. & Prof. Code sec. 19412 (West 2008).

rare occasions when an overwhelming favorite finishes in the money (wins, places, or shows) and, pursuant to the actual odds, pays something less than $2.10 on a $2 bet (say $2.05), the extra nickel due each winning bettor on a $2 bet will constitute an additional amount that must be extracted from the takeout, see, e.g., Cal. Bus. & Prof. Code (Cal. Code) sec. 19613.5 (West 2008), an occurrence that might cause the track to lose money on the race. The balance of the betting pool remaining after reductions for takeout and "breakage" (the odd cents not paid to winning bettors because payoffs are rounded down to the nearest dime), is paid out to the winning bettors.

Petitioner argues that, in extracting takeout from the betting pools, "[t]he tracks are acting in the capacity of a fiduciary, i.e., collection of taxes and fees which they are remitting to the different state and local tax authorities." He likens the process to that of an "employer collecting payroll taxes from the employees and remitting them to the IRS and the state agencies." He argues that his pro rata share of the takeout constitutes the business expense of a professional gambler and, as such, is not a loss from wagering transactions subject to disallowance under section 165(d). In support of that argument, petitioner relies primarily upon our Opinion in Mayo v. Commissioner, 136 T.C. 81, 97 (2011), in which we held that nonwagering business expenses claimed in connection with carrying on a

gambling business are deductible under section 162(a) and not subject to the section 165(d) limitation on the deductibility of wagering losses.

At trial, petitioner argued that he is entitled to deductions or losses under section 162, 165, or 212 on the basis of a blended (average) takeout rate of 19% as applied to his wagers for the years at issue. On brief, he states his willingness to settle for a "minimum 15% take out percentage" as applied to those wagers. In the gambling loss years, he calculates that that would result in expense or loss deductions of $64,235 for 2005, $78,359 for 2006, $66,624 for 2007,[8] $46,919 for 2008, and $36,535 for 2009.[9] He argues for the deductibility of those amounts on the basis of Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), which holds that, in the absence of adequate substantiation of deductible expenditures, the taxpayer is entitled to a deduction, under section 162, for a reasonable estimate of such expenditures. See id. at 543-544. Only for 2009 does petitioner's estimated

[8]The deductibility of petitioner's 2007 wagering losses is not in dispute because they did not exceed his 2007 wagering gains. Therefore, they are fully deductible against those gains under sec. 165(d).

[9]It is unclear whether petitioner is arguing that he should be able to deduct those amounts in full or only that presumably lesser portion of each amount corresponding to the taxes and license fees paid by the track. On brief, he asks that we uphold his deducting the amounts that "he paid to the race tracks for taxes and licenses which in turn paid the same to the state and local [government]". The distinction is of no matter since we reject his argument that he is entitled to any deduction on account of takeout.

takeout deduction exceed his disallowed net wagering loss.  In the other three gambling loss years, the alleged takeout deduction covers only a fraction of the net wagering loss disallowance.  See supra note 5.

### b. Applicability of Section 165(d)

Petitioner argues that section 165(d) does not apply to the expenses, including the net wagering losses, of a professional gambler.  Petitioner states his position as follows:

> Professional gamblers should be allowed the same protection as any other profession when the activity is legal and conducted as a profession.  In a lawful and democratic society, Congress enacted this law many decades ago, only because at that time, "gambling was taboo".  Now gambling is legal in most States in the Union and this law is unjust, not interpreted correctly.  In my opinion the intention of Congress, even then, was not to penalize any profession but to prevent abuse when it was conducted as a recreation.  Section 165(d) should be considered unconstitutional and struck down as gambling is part of American life and professional gamblers are recognized in society and on television.

In support of his view that, today, section 165(d) constitutes a discriminatory, unconstitutional deprivation of professional gamblers' right to the equal protection of the laws, petitioner cites the following paragraph from our Memorandum Opinion in Tschetschot v. Commissioner, T.C. Memo. 2007-38, 2007 WL 518989, at *5, in which we sustained the disallowance of a professional poker player's net losses from tournament poker against the taxpayer's equal protection argument:

The moral climate surrounding gambling has changed since the tax provisions concerning wagering were enacted many years ago. Not only has tournament poker become a nationally televised event, but casinos or lotteries can be found in many States. Further, the ability for the Internal Revenue Service to accurately track money being lost and won has improved, and some of the substantiation concerns, particularly for professionals, no longer exist. That said, the Tax Court is not free to rewrite the Internal Revenue Code and regulations. We are bound by the law as it currently exists, and we are without the ability to speculate on what it should be. * * *

Petitioner responds to the last two sentences of the quoted excerpt from

Tschetschot with the hope that "the judiciary is at some time [presumably, meaning this Court in this case] going to take a bold stance and help to reverse section 165(d) of the Internal Revenue Code."

Lastly, petitioner relies on Cronan v. Commissioner, 33 B.T.A. 668, 670 (1935), and Beaumont v. Commissioner, 25 B.T.A. 474, 482 (1932), aff'd, 73 F.2d 110 (D.C. Cir. 1934), in which we acknowledged with approval the Commissioner's position that losses incurred in betting on horse races for profit where legal are deductible.

## 2. Respondent's Arguments

With respect to petitioner's alleged right to a deduction for his pro rata share of the takeout, respondent argues (1) because takeout is paid from the pool

remaining from losing bets,[10] it "is inseparable from the wagering transaction and constitutes wagering losses" subject to the section 165(d) limitation and (2) the taxes, license fees, and other expenses discharged from the takeout are expenses owed and paid by the track, not by the individual bettor. Respondent also argues that, even if a deduction for takeout were available to petitioner, his failure to furnish the factual information necessary to make a reasonable determination of the takeout percentage applicable to his losing bets (e.g., the extent to which those bets were attributable to the various parimutuel pools with varying takeout percentages at tracks in various States) is sufficient to bar petitioner's right to a passthrough deduction for takeout.

With respect to petitioner's equal protection argument, respondent points out that, in Tschetschot, we rejected that argument on the basis of our holding in Valenti v. Commissioner, T.C. Memo. 1994-483, 1994 WL 534499. In Valenti, after noting the historical distinction between gambling and other forms of business activity, we held that "a classification that differentiates the business of gambling from other business has 'a rational basis, and when subjected to judicial

_____

[10]As noted supra, the takeout percentage is applied to the entire betting pool, but, because the winning bettors are entitled to recover the amounts of their bets (i.e., the amounts they contributed to the pool) plus their winnings, the takeout must, of necessity, come from the losing bets.

scrutiny * * * [it] must be presumed to rest on that basis if there is any conceivable state of facts which would support it'". Id., 1994 WL 534499, at *4 (quoting Carmichael v. S. Coal & Coke Co., 301 U.S. 495, 509 (1937)). We concluded: "The argument that section 165(d) violates equal protection as applied to those engaged in the trade or business of gambling borders on the frivolous." Id. Thus, respondent argues that petitioner's equal protection argument is contrary to settled law and, therefore, should be rejected.

B.    Analysis

1.    Petitioner's Right to a Deduction for Takeout

Petitioner makes no argument that a parimutuel betting pool is either a cost-sharing arrangement or a business entity (such as a partnership) in whose profits and losses he is entitled to share. His only argument is that, on his behalf, the track was paying his expenses, of a type, such as taxes and license fees, that he could deduct as, for instance, section 162(a) ordinary and necessary business expenses. We agree with respondent that the taxes, license fees, and other expenses discharged from the takeout are expenses imposed upon the track, not the bettors. That that is so may be illustrated by Cal. Code secs. 19400-19668, addressing horse racing and, in particular, secs. 19610-19619, addressing license fees, commissions, and purses.

The term "association" is defined in Cal. Code sec. 19403 to mean "any person engaged in the conduct of a recognized horse race meeting." Cal. Code sec. 19411 defines parimutuel wagering. In pertinent part, that section provides: "The association distributes the total wagers comprising each pool, less the amounts retained for purposes specified in this chapter [i.e., the takeout], to winning bettors based on the official race results." The amounts retained represent a percentage of the total amount handled in conventional and exotic parimutuel pools. Cal. Code sec. 19610 (West 2008). The actual percentage retained is 15% for conventional pools, 16.75% for exotic pools; it is 17.75% for harness racing tracks. Id. Cal. Code sec. 19611 sets forth the portions of the takeout that thoroughbred associations must pay as license fees, distribute to the California Thoroughbred Breeders Association (for expenses, educational, and other purposes), or distribute as purses and commissions. Nowhere in the statute is responsibility for any of those payments imposed on persons making bets.[11]

_____

[11]Petitioner's testimony at the trial, in which he agreed with respondent's counsel that "all my bets are not on California horse tracks only", indicates that a substantial portion of his bets, probably a majority, were placed at tracks in California, his State of residence. Thus, California law applicable to takeout is particularly relevant to petitioner. Moreover, the various descriptions of parimutuel betting, in general, and takeout, in particular, available on the Internet indicate that California's treatment of takeout is typical of the other States where horse racing and parimutuel betting are permitted. See, e.g., Library Index, Sports

(continued...)

Petitioner's attempt to analogize the track's retention and disbursement of takeout to an employee's payroll tax obligations with respect to his employees is misguided. First and foremost, none of the payments the track makes from the handle discharge any obligation of any bettor. And while reduction of the parimutuel pool by the amount of the takeout reduces the amount in the pool available to pay winning wagers (i.e., it reduces the bettor's odds should he win[12]), none of the takeout can be said to come from a winning bettor's wager, which in all events must be returned to him in full and with at least a small profit.[13] Nor can

---

[11](...continued)
Gambling, http://www.libraryindex.com/pages/1611/Sports-Gambling-PARI-MUTUEL-GAMBLING: "The management's share [of a betting pool] is called the takeout * * * [which is] set by state law and is usually around 20%. * * * This money goes toward track expenses, taxes, and the purse. Most states also require that a portion of the take-out goes into Breeder Funds to encourage horse breeding and health in the state."

[12]For example, assume 20% of a $100 parimutuel bet-to-win pool (i.e., $20) is wagered on a particular horse, and that horse wins. If the track's takeout with respect to that pool is 20%, so that only $80 is available to pay the winners, the odds on that horse to win will have been 3:1; i.e., the $20 bet on the horse will return to the bettors $80 (the original $20 bet plus a $60 (3 x $20) profit). If the track's takeout is 0% so that the entire $100 pool is available to pay the winners, the odds on that horse to win will have been 4:1; i.e., the $20 bet on the horse will return to the bettors $100 (the original $20 bet plus an $80 (4 x $20) profit).

[13]And since the amount paid out from the pool is net of takeout, no winner needs a deduction to make the amount distributed to him correspond to the sum of (1) his wager and (2) his taxable gain.

the takeout be said to add to the loss of a losing bettor, who loses the same $2 whether the takeout is 15% of the handle, 20% of the handle, or none of it on account of a minus pool so deep as to deprive the track of any take after paying all winning wagers.[14]  Moreover, not being an obligation or expense of the bettor, takeout cannot qualify as the bettor's deductible nonwagering business expense under Mayo v. Commissioner, 136 T.C. at 97.

On the basis of the foregoing, we hold that petitioner is not entitled to a passthrough deduction, under section 162, 165, or 212, for a pro rata share of takeout.

### 2. The Validity of Section 165(d)

We agree with respondent that the reasoning in our Opinion in Valenti is dispositive of petitioner's equal protection claim.  In Valenti, we held that the application of section 165(d) to the net gambling losses of a professional gambler does not violate the gambler's constitutional right to the equal protection of the laws.  We would add to Judge Raum's refutation of the taxpayer's argument to the contrary only that the dissipation, in recent times, of the historical moral

---

[14]Petitioner virtually concedes that point on brief when he emphasizes the function of the takeout, noting that "racetracks do not operate for free, they have to pay to operate the racetrack * * * [p]lus they have to comply with the regulations promulgated by the Business and Professions Code and the [S]tate and local authorities to pay taxes to operate the racetrack."  (Emphasis added.)

opposition to gambling does not undercut the "rational basis" for treating professional gambling losses differently from other business-related losses. H.R. Rept. No. 73-704 (1934), 1939-1 C.B. (Part 2) 554, is the report of the Committee on Ways and Means accompanying H.R. 7835, 73d Cong. (1934), which, as enacted, became the Revenue Act of 1934, ch. 277, 48 Stat. 680. The Revenue Act of 1934 sec. 23(g), 48 Stat. at 689, is the predecessor to section 165(d), and H.R. Rept. No. 73-704, supra, 1939-1 C.B. (Part 2) at 570, explains that new provision as follows:

> Section 23(g). Wagering losses: Existing law does not limit the deduction of losses from gambling transactions where such transactions are legal. Under the interpretation of the courts, illegal gambling losses can only be taken to the extent of the gains on such transactions. A similar limitation on losses from legalized gambling is provided for in the bill. Under the present law many taxpayers take deductions for gambling losses but fail to report gambling gains. This limitation will force taxpayers to report their gambling gains if they desire to deduct their gambling losses.

The basis for the enactment of section 23(g), as set forth in the last sentence of the foregoing committee report, still pertains to taxpayer reporting of gambling gains and losses. Therefore, it still constitutes a "rational basis" for the continued application of section 165(d) to the losses.[15] There being no constitutional

---

[15]The problem of unreported gambling gains has been mitigated, but not eliminated, by the payor's obligation to report and, in some cases, withhold

(continued...)

impediment to the continued application of section 165(d), we reiterate our admonition in Tschetschot that this Court "is not free to rewrite the Internal Revenue Code and regulations * * * [but is] bound by the law as it currently exists". Tschetschot v. Commissioner, 2007 WL 518989, at *5. See also Nitzberg v. Commissioner, 580 F.2d 357, 358 (9th Cir. 1978), rev'g T.C. Memo. 1975-228, and Mayo v. Commissioner, 136 T.C. 81, 90 (2011), both of which hold that a professional gambler's wagering losses in excess of wagering gains are nondeductible under section 165(d).

Lastly, we note that petitioner's reliance on our decisions in Cronan and Beaumont is misplaced as both those decisions involved tax years before the effective date, and were superseded by the 1934 enactment, of section 23(g).

C.     Conclusion

Petitioner is not entitled to deduct all or any portion of his net gambling losses.

---

[15](...continued)
Federal and State taxes from large winnings. See IRS Form W-2G, Certain Gambling Winnings, and accompanying instructions.

II.     Imposition of the Section 6662(a) Accuracy-Related Penalty

    A.     Applicable Law

Section 6662(a) and (b)(1)-(3) provides for an accuracy-related penalty (penalty) in the amount of 20% of the portion of any underpayment attributable to, among other things, negligence or intentional disregard of rules or regulations (without distinction, negligence), any substantial understatement of income tax, or any substantial valuation misstatement.  Although the notices issued to petitioner state that respondent bases his imposition of the penalty upon "one" of the three above-referenced grounds, it is clear that only the first two (negligence and substantial understatement of income tax) are potentially applicable herein.

A substantial understatement of income tax exists for an individual if the amount of the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  See sec. 6662(d)(1)(A).  At the conclusion of the trial, the Court asked respondent to provide the Court with computations, incorporating the issues settled before trial, that would show whether there would be a substantial understatement of income tax for each of the years at issue assuming we found for respondent on the section 165(d) issue.  In response to that request, on May 16, 2013, respondent filed a status report for each of the consolidated cases establishing that petitioner's understatements of income tax for

the years at issue are substantial as they exceed both 10% of the correct tax and

$5,000.[16]  Therefore, we need not consider the grounds for determining whether

petitioner was negligent within the meaning of section 6662(b)(1).

Section 6664(c)(1) provides that the penalty shall not be imposed with

respect to any portion of an underpayment if a taxpayer shows that there was

reasonable cause for, and that the taxpayer acted in good faith with respect to, that

portion.

> The determination of whether a taxpayer acted with reasonable cause
> and in good faith is made on a case-by-case basis, taking into account
> all pertinent facts and circumstances.  * * *  Circumstances that may
> indicate reasonable cause and good faith include an honest
> misunderstanding of * * * law that is reasonable in light of all of the
> facts and circumstances, including the experience, knowledge, and
> education of the taxpayer.  * * *

Sec. 1.6664-4(b)(1), Income Tax Regs.

B.     Analysis

Under section 7491(c), respondent bears the burden of production, but not

the overall burden of proof, with respect to petitioner's liability for the section

6662(a) penalty.  See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

_____

[16]Although petitioner did not incur (and, therefore, did not report) a net
wagering loss for 2007, there was, nonetheless, a substantial understatement of
income tax for that year attributable to petitioner's carryover of net wagering
losses from prior years.

We have previously stated that the "burden imposed by section 7491(c) is only to come forward with evidence regarding the appropriateness of applying a particular addition to tax or penalty to the taxpayer." Weir v. Commissioner, T.C. Memo. 2001-184, 2001 WL 829881, at *5. By demonstrating that petitioner's understatements of income tax exceed the thresholds for a finding of "substantial understatement of income tax" under section 6662, respondent has satisfied his burden of production.

On brief, petitioner argues that he "should not be liable for the section 6662 penalty * * * because * * * [he] was not aware of section 165(d) * * * [,] there was reasonable cause and * * * [he] acted in good faith with respect to the understatement * * * [,] [he] did not intentionally ignore the law [, and he] exercised due care in reporting the numbers on his tax returns". We held in Carlebach v. Commissioner, 139 T.C. 1, 16-17 (2012), that a taxpayer cannot avoid the application of the section 6662(a) penalty by pleading that he acted with reasonable cause and good faith on account of his ignorance of the applicable law. As we stated in that case: "A taxpayer's ignorance of the law is no excuse for failure to comply with it."

Moreover, petitioner, a certified public accountant with an active tax preparation practice, and admittedly aware of section 165 governing the

deductibility of losses, should have been aware of the section 165(d) limitation on net gambling losses. Also, as a professional gambler who regularly bets on horse races and understands parimutuel betting, he must have known that takeout represents the track's share of the betting pool and that the expenditures therefrom satisfy obligations of the track, not the bettors. Moreover, as respondent points out, petitioner's argument that he is entitled to deduct a pro rata portion of the takeout was not reflected on his returns for the years at issue and, more than likely, represents an argument developed for trial rather than a good-faith position taken at the time he prepared those returns.

### C. Conclusion

Petitioner is liable for the section 6662(a) accuracy-related penalty for the years at issue.

Decisions will be entered under Rule 155.