T.C. Memo. 2017-193

UNITED STATES TAX COURT

JAMES BONEPARTE, JR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 28563-14.                                      Filed October 2, 2017.

James Boneparte, Jr., for himself.

<u>Kathleen K. Raup</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  The respondent (referred to here as the "IRS") issued

two notices of deficiency to the petitioner, James Boneparte, Jr.:  one for the 2012

tax year and one for the 2013 tax year.  The IRS determined the following

[*2] deficiencies in income tax, additions to tax, and accuracy-related penalties for the 2012 and 2013 tax years.[1]

| Year | Deficiency | Additions to tax | | | Accuracy-related penalty |
|---|---|---|---|---|---|
| | | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6654(a) | Sec. 6662(a) |
| 2012 | $21,090 | $1,187 | --- | --- | $4,218 |
| 2013 | 17,210 | 2,007 | $268 | $144 | --- |

Boneparte filed a petition under section 6213(a) for redetermination of the deficiencies for both years.[2] We have jurisdiction under section 6214(a).

After we take into account concessions by the IRS described later in the opinion, the issues for decision are:

1.    Was Boneparte a professional gambler in 2012 or 2013? We hold that he was not.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code ("Code") in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

[2]Boneparte resided in New Jersey when he filed his petition. Therefore, any appeal of our decision in this case would go to the U.S. Court of Appeals for the Third Circuit unless the parties designate the Court of Appeals for another circuit. See sec. 7482(b)(1) and (2).

**[\*3]**

2. Is Boneparte entitled to an itemized deduction for wagering losses of $18,000 for 2012? We hold that he is so entitled.

3. Is Boneparte entitled to a deduction of $3,592 for payment of real-estate taxes for 2012? We hold that he is not so entitled.

4. Is Boneparte liable for an addition to tax under section 6651(a)(1) for 2012? We hold that he is liable for the addition to tax.

5. Is Boneparte liable for an accuracy-related penalty under section 6662(a) for 2012? We hold that he is liable for the penalty.

To place the facts of this case in perspective, it is helpful to understand the federal-income-tax treatment of gambling activity and how the income from gambling activity can be reported on federal-income-tax returns. The amount of federal income tax depends on taxable income. Sec. 1(c). Calculating taxable income requires calculations of both gross income and adjusted gross income. Gross income is defined as all income from whatever source derived. Sec. 61(a). Adjusted gross income is defined as gross income minus certain deductions known as above-the-line deductions. Sec. 62(a). One above-the-line deduction is the deduction under section 62(a)(1) for business expenses of self-employed taxpayers.

**[\*4]** Taxable income for taxpayers who itemize deductions is equal to adjusted gross income (i.e., taxable income minus above-the-line deductions) minus itemized deductions and the personal-exemption deduction. Sec. 63(a). One itemized deduction of significance for this case is the deduction allowed under section 213(a) for an amount equal to the medical expenses paid by the taxpayer for the year minus a percentage of adjusted gross income. The percentage of adjusted gross income for the 2012 year is 7.5%. Sec. 213(a). For 2013, it is 10%. Id. Another itemized deduction is the deduction under section 165(a) for any "loss".

For taxpayers who take the standard deduction, taxable income is equal to adjusted gross income (i.e., taxable income minus above-the-line deductions) minus the standard deduction and the personal-exemption deduction. Sec. 63(b). The standard deduction is a dollar amount that is adjusted each year for inflation and varies according to the taxpayer's filing status. Sec. 63(c). For tax year 2012, the standard deduction for a taxpayer filing as single was $5,950. See 2012 Instructions for Form 1040, U.S. Individual Income Tax Return. For 2013 it was $6,100. See 2013 Instructions for Form 1040, U.S. Individual Income Tax Return. Itemized deductions do not affect the taxable income of taxpayers who choose the standard deduction. Sec. 63(b).

**[*5]**   The Code does not set forth specific rules for determining income and losses for gambling activity except that section 165(d) provides that "[l]osses from wagering transactions shall be allowed only to the extent of the gains from such transactions."  The taxation of gambling activity is determined by this Code provision as it interacts with the more general Code provisions.

For professional gamblers (i.e., those taxpayers who are in the business of gambling), the Code has been interpreted as distinguishing between two types of expenses.  See Mayo v. Commissioner, 136 T.C. 81, 91, 96-97 (2011) (holding that losses from wagering transactions under section 165(d) include the "cost of losing wagers" but not the "more general expenses incurred in the conduct of a gambling business").  First, there are the direct costs of gambling--essentially the cost of placing a wager.  Second, there are the indirect expenses of gambling, such as the cost of traveling to the casino.  We refer to these latter expenses as the nonwagering expenses of gambling.

The costs of wagering are accounted for in the losses and gains from wagering transactions under section 165(d).  Section 165(d) governs professional gamblers.  Offut v. Commissioner, 16 T.C. 1214 (1951) (followed on this point by Mayo v. Commissioner, 136 T.C. at 90).  Section 165(d) is applied by comparing the gains from wagering transactions for the year with the losses from wagering

[*6] transactions for the year. Sec. 1.165-10, Income Tax Regs. If the gains exceed the losses, then there is a deduction equal to the losses. If the losses exceed the gains, then the deduction is equal to the gains. The deduction is an above-the-line deduction under section 62(a). See, e.g., Schollenberger v. Commissioner, T.C. Memo. 2009-306; LaPlante v. Commissioner, T.C. Memo. 2009-226; Merkin v. Commissioner, T.C. Memo. 2008-146, slip op. at 7 ("If a taxpayer is engaged in the trade or business of gambling, his losses from gambling, up to the amount of his gains from such transactions, would be deductible in arriving at his adjusted gross income. See secs. 62, 165(d). Thus, if Dr. Merkin's gambling activity constituted a trade or business, his losses from gambling as reported on Schedule C up to the amount of his gambling winnings as reported on that schedule would be deductible in arriving at adjusted gross income.").

We now discuss the nonwagering expenses of professional gambling. These expenses are not computed as part of the gains or losses from wagering transactions in section 165(d). Mayo v. Commissioner, 136 T.C. at 97. We need not discuss further the appropriate tax treatment of the nonwagering expenses of professional gamblers, other than to observe that, like the taxpayer in Chow v. Commissioner, T.C. Memo. 2010-48, 99 T.C.M. (CCH) 1193, 1194 (2010), aff'd,

**[*7]** 481 F. App'x 406 (9th Cir. 2012), Boneparte reported his nonwagering expenses of gambling as an above-the-line deduction under section 62(a). It is not necessary to say whether this is the correct way to report the nonwagering expenses of professional gambling because, as we explain below, we hold that Boneparte is not a professional gambler.

A professional gambler (who is self-employed) is expected by the IRS to fill out a Schedule C, "Profit or Loss From Business". Schedule C is the attachment to Form 1040 that is completed by self-employed taxpayers. The Schedule C contains various line items for reporting income and expenses from a business. Near the bottom of the Schedule C is a line item for the net profit or loss from the business, line 31. The amount on this line of the Schedule C is to be copied to line 12 of the Form 1040, which is labeled "Business income or (loss) * * *". The vertical placement of line 12 on the Form 1040 is such that the amount on line 12 is taken into account in the computation of adjusted gross income. Thus, the business expenses reported on Schedule C, which are arithmetically incorporated in the business income or loss amount on line 12, are reported as an above-the-line deduction on the Form 1040. As for the gains and losses from wagering transactions, the instructions for the Schedule C and the Form 1040 do not explain exactly how a professional gambler should report them. However, if a

[*8] professional gambler reports the losses from wagering transactions anywhere on the Schedule C, these reported losses would be channeled into line 12 on the Form 1040 and therefore incorporated into adjusted gross income. The losses would be reported as an above-the-line deduction.

Now consider the tax treatment of the gambling activities of casual gamblers, i.e., persons who are not professional gamblers. The first step is to determine the gain or loss for each wagering transaction. A wagering transaction results in a gain if the winning exceeds the cost of the wager. A wagering transaction results in a loss if the cost of the wager exceeds the winning. The gains for all wagering transactions for which there is a gain are totaled. See sec. 1.165-10, Income Tax Regs. These are the gains from wagering transactions within the meaning of section 165(d). Gross income is increased by this total gain.[3] This increase in gross income is also reflected in adjusted gross income. See sec. 62(a) (defining adjusted gross income as gross income minus above-the-

---

[3]Calculating the gain from each wager by subtracting the cost of the wager is consistent with the holdings in cases in which the Court, drawing an analogy between wagering winnings and the recovery of a capital investment, has held that a casual gambler's gross income from a wagering transaction should be calculated by subtracting the bets placed to produce the winnings, not as a deduction in calculating adjusted gross income or taxable income, but as a preliminary computation in determining gross income. See Lutz v. Commissioner, T.C. Memo. 2002-89 (slot machine winnings); Hochman v. Commissioner, T.C. Memo. 1986-24 (horse race winnings).

**[*9]** line deductions). The losses from all wagering transactions that resulted in a loss are totaled. These are the losses from wagering transactions within the meaning of section 165(d). If this total loss exceeds the total gain, then the taxpayer is entitled to an itemized deduction equal to the total gain. Sec. 165(d). (For example, consider a casual gambler who makes only the following wagers throughout the year: a wager of $10 for a win of $50, and five losing wagers totaling $50. Gross income is increased by $40. The taxpayer has an itemized deduction of $40.) As an itemized deduction, the wagering loss does not reduce adjusted gross income. This is a disadvantage for the taxpayer because the amount of adjusted gross income affects the amount of certain below-the-line deductions such as the medical-expense deduction. See sec. 213(a); see also sec. 68; Calvao v. Commissioner, T.C. Memo. 2007-57.

The next thing to consider is the tax treatment of the nonwagering expenses of gambling by a casual gambler. A deduction attributable to any activity not engaged in for profit, such as casual gambling, is allowed only to the extent provided in section 183(b). Sec. 183(a). Section 183(b)(1) provides that a taxpayer is allowed the deductions that would be allowable without regard to whether the activity is engaged in for profit. Section 183(b)(2) provides that a taxpayer is allowed a deduction equal to the amount of the deductions that would

**[*10]** be allowable only if the activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of section 183(b)(1).

Recall that section 165(d) provides that "[l]osses from wagering transactions shall be allowed only to the extent of the gains from such transactions".  The deduction under section 165(d) is allowable without regard to whether the wagering transactions giving rise to the losses are engaged in for profit.  See Mayo v. Commissioner, 136 T.C. at 90.  Therefore the deduction allowed by section 165(d) is included in the deductions allowed by section 183(b)(1).

The nonwagering expenses of casual gambling often fall into section 183(b)(2); and in this case there is no dispute that Boneparte's nonwagering expenses of gambling would fall into the section 183(b)(2) category if he is considered a casual gambler.

A casual gambler by definition does not operate a business, does not fill out a Schedule C, and therefore would have no amount on line 12 of Form 1040 for business income or loss.  As for the gains from wagering transactions, the casual gambler is instructed by the IRS to report such gains on line 21 of Form 1040, labeled "Other income".  2012 Instructions for Form 1040, U.S. Individual Income

**[*11]** Tax Return; 2013 Instructions for Form 1040, U.S. Individual Income Tax Return.  This line corresponds to the reporting of gross income.  To report the section 165(d) deduction for losses from wagering transactions, the casual gambler is instructed by the IRS to use line 28 of Schedule A, "Itemized Deductions".  Instructions for Schedule A (Form 1040), A-1.

With this background in mind, we can now set out the facts of this case.

FINDINGS OF FACT

Some facts are stipulated, and they are so found.

Boneparte graduated from Williams College in Massachusetts with a B.A. in history in 1973.

During 2012 and 2013 Boneparte resided in Newark, New Jersey.

Since 1981 Boneparte has worked for the Port Authority of New York and New Jersey.  During 2012 and 2013, Boneparte was employed full-time by the Port Authority as a "tunnel bridge agent" at the Lincoln Tunnel.  During 2012 and 2013, Boneparte's hours of work during each work day usually consisted of an 8-hour shift from 2 p.m. to 10 p.m.  The days he worked followed the following pattern over a 19-day period:  4 days on, 2 days off, 4 days on, 2 days off, 5 days on, and 2 days off.

[*12] Boneparte earned approximately $35 per hour at the Port Authority in 2012 and 2013. Boneparte's annual earnings from the Port Authority from 2008 through 2013 were:

| Year | Amount earned |
|------|------|
| 2008 | $75,000 |
| 2009 | 109,000 |
| 2010 | 75,000 |
| 2011 | 60,000 |
| 2012 | 78,821 |
| 2013 | 82,350 |

Boneparte also received retirement distributions in 2012 and 2013. For 2012, he reported a gross retirement distribution of $44,550, of which he reported $13,652 as includable in income. The IRS does not contest the tax treatment he reported for this distribution. For 2013, he reported a gross retirement distribution of $49,278, of which he reported $10,753 as includable in income. As explained below, the notice of deficiency for 2013 determined that he did not report the $10,753 as income on his 2013 return, but the IRS has since conceded that he did. Although a taxpayer's receipt of retirement distributions might conceivably affect the determination of whether the taxpayer is a professional gambler, see sec. 1.183-2(b)(8), Income Tax Regs., neither party in this case asks the Court to make findings of fact regarding the retirement distributions or to draw conclusions

**[*13]** about Boneparte's professional status from his receipt of the retirement distributions.

Boneparte's gambling activity

Boneparte regularly drove back and forth to Atlantic City, New Jersey, where he gambled.[4]  He testified that he spent 75% of his nights in hotels in Atlantic City rather than at his house in Newark.  Documentary evidence substantiates that he traveled to Atlantic City frequently but not as frequently as his 75% estimate would suggest.  We find that he spent 33%-50% of his nights in Atlantic City in 2012 and 50%-67% in 2013.

Boneparte gambled at horse racetracks and in casinos.  At the casinos his preferred game was baccarat, but he also played other table games as well as slots.  Sometimes he gambled alone, and sometimes he gambled with a friend.  He gambled primarily in Atlantic City.  He did not keep a contemporaneous written log of winnings and wagers.  As described in greater detail below, the trial record contains statements from casinos describing his wagering activity during the two years in issue, 2012 and 2013.  These statements show that he lost money in wagers at each casino in each of the two years.  We also conclude that Boneparte

---

[4]The record does not reveal whether Boneparte left directly for Atlantic City from his place of work at the Lincoln Tunnel or whether he first went home to Newark, New Jersey.

**[*14]** lost money in total wagers in the years 2009, 2010, and 2011. The trial record does not contain statements from casinos for these years, but his losses at each casino in 2012 and 2013 (and the fact that his method of gambling, which was unchanged over the years, was to make frequent bets at unskilled games such as baccarat and slots) suggest he lost money in 2009, 2010, and 2011, too. This suggestion is not contradicted by his tax returns. Of the three years, 2009, 2010, and 2011, only his return for 2009 is in the record. On that tax return he did not report a total wagering gain for 2009.

Because Boneparte lost money in total wagers in the years 2009-13, a fortiori he did not earn a profit from gambling for any of the years 2009-13. This is because the profit (and loss) from gambling includes not just the winnings from wagers but also the nonwagering expenses of gambling (i.e., expenses other than the amounts wagered). Taking these expenses into consideration in measuring his profits or losses would only decrease his profits (and increase his losses).

For tax year 2012, the record contains annual statements from 14 casinos at which Boneparte gambled. None of the statements shows the amount wagered or the winnings for any particular wager. One statement (for Golden Nugget) shows the amount of his monthly gain or loss for each month of the year. Another statement (for Trump Taj Mahal) shows the amount of his daily gain or loss for

[*15] each day of the year.  One statement (for NJAW) shows total winnings for the year and total wagers for the year.  The other 11 statements show only the total annual amount that Boneparte gained or lost at the casino that issued the statement.  The table below shows the annual net wagering gains or losses reported on the 14 statements.

| Casino | Net gains/losses |
| --- | --- |
| NJAW | ($217) |
| Golden Nugget Atlantic City | (2,958) |
| Bally's | (1,115) |
| Caesars (Atlantic City, N.J.) | (56) |
| Caesars (Las Vegas, Nev.) | (5) |
| Flamingo | (21) |
| Harrah's | (62) |
| Showboat | (666) |
| The Quad Casino and Resort | (2) |
| Tropicana Casino and Resort | (1,891) |
| Meadowlands Racetrack | (56) |
| Borgata | (622) |
| Trump Taj Mahal | (4,383) |
| Trump Plaza | (2,833) |
| Total | (14,887) |

As shown in the table above, Boneparte's annual loss at NJAW was $217.  This amount is not on the NJAW statement.  Rather, the statement shows amounts wagered of $2,048 and amounts won of $1,831.  The difference between these amounts is $217.  From this statement Boneparte argues that his annual loss was $217, equal to $2,048 minus $1,831.  By contrast, the IRS argues that Boneparte

[*16] had a gain for the year at the NJAW casino of $1,831. But this computation does not account for the $2,048 of wagers shown on the statement. Therefore, we agree with Boneparte on this point. We find that Boneparte's annual loss at NJAW was $217.

In total, the 14 statements for the casinos for the 2012 year show Boneparte had net losses of $14,887 from wagers during that year.

For 2013, there are annual statements from 12 casinos at which Boneparte gambled. None of the statements shows the amount wagered or the winnings for any particular wager. One statement (for Golden Nugget) shows the amount of his monthly gain or loss for each month of the year. One statement (for Trump Taj Mahal) shows the amount of his daily gain or loss for each day of the year. The other 10 statements show only the total annual amount that Boneparte gained or lost at the casino that issued the statement.

The table below shows the annual net gains or losses reported on the 12 statements for 2012.

[*17]

| Casino | Net gains/losses |
|---|---|
| Trump Taj Mahal | ($2,901) |
| Powerball lottery | (8) |
| Golden Nugget Atlantic City | (606) |
| Trump Plaza | (5,178) |
| Bally's | (1,077) |
| Caesars (Atlantic City, N.J.) | (126) |
| Flamingo | (1) |
| Harrah's | (24) |
| Showboat | (122) |
| The Quad Casino and Resort | (87) |
| Borgata | (1,647) |
| Tropicana Casino and Resort | (832) |
| Total | (12,609) |

In total, the 12 statements for the casinos for the 2013 year show Boneparte had net losses of $12,609 from wagers during that year.

2012 tax return

April 15, 2013 was the due date for Boneparte's 2012 federal-income-tax return.

On June 7, 2013, Boneparte filed his 2012 return on a Form 1040. See infra part 4. His return was late. Boneparte prepared his return himself and did not consult any tax professionals.

**[*18]**  On his Form 1040, Boneparte reported that his occupation was "T.B.A. Port Auth NY & NJ".  This presumably means Toll Bridge Agent Port Authority of New York and New Jersey.

Boneparte reported his income and losses from gambling activity both as a professional gambler (on the Schedule C) and as a casual gambler (income on line 21 of Form 1040 and loss on line 28 of Schedule A).

His Schedule C stated that his "Principal business or profession" was "professional gambler".  The Schedule C reported the following income and expenses:

[*19]

| 2012 Schedule C | Amount claimed |
|---|---|
| Income | |
| Gross receipts | $18,000 |
| Returns and allowances | (18,000) |
| Gross income | 0 |
| Expenses | |
| Car and truck expenses | 38,150 |
| Depreciation | 3,550 |
| Insurance | 4,868 |
| Legal and professional services | 6,900 |
| Office expenses | 1,020 |
| Rent or lease--vehicles, machinery, and equipment | 300 |
| Rent or lease--other business property | 1,128 |
| Repairs and maintenance | 1,100 |
| Supplies | 3,900 |
| Travel | 12,900 |
| Deductible meals and entertainment | 15,300 |
| Total expenses | 89,116 |
| Net business income | (89,116) |

Boneparte duly copied the -$89,116 entry for net business income at the bottom of the Schedule C to line 12 of his Form 1040.

It is unclear how Boneparte calculated the $18,000 of receipts and the $18,000 of returns and allowances that he reported on the Schedule C. Thus, it is unclear whether he intended to report that the amount of his gains from wagering transactions was $18,000 and that his losses from wagering transactions was limited to $18,000. The total expenses reported on the Schedule C were $89,116.

**[\*20]** It is apparent that Boneparte intended to report that $89,116 was the amount of nonwagering expenses of gambling.

On line 21, "Other income", of the Form 1040, Boneparte reported $18,000 of what he labeled "Gambling" income. The placement of line 21 on the Form 1040 meant that the $18,000 Boneparte reported on this line was included in gross income.

Boneparte reported that his adjusted gross income was $22,100.

On Schedule A, line 28, Boneparte claimed an $18,000 itemized deduction for "Gambling Income". On that Schedule A he also claimed an itemized deduction for $3,592 of real-estate taxes. Boneparte also claimed an itemized deduction for medical expenses. After reducing his medical expenses of $12,292 by 7.5% of his reported adjusted gross income (i.e., 7.5% × $22,100 = $1,658), he claimed a medical-expense deduction of $10,634.

The return reported zero taxable income and zero tax.

2013 tax return

On or about April 15, 2014, Boneparte timely filed his 2013 federal-income-tax return on a Form 1040. Boneparte prepared the return himself and did not consult any tax professionals.

**[*21]**  On his Form 1040, Boneparte reported that his occupation was "T.B.A. Port Auth NY & NJ".

As with his 2012 return, Boneparte reported his income and loss from gambling activity both as a professional gambler (on a Schedule C) and as a casual gambler (on line 21 of Form 1040 and line 28 of Schedule A).

His Schedule C for 2013 stated that his "Principal business or profession" was "professional gambler".  The Schedule C reported the following income and expenses:

[*22]

|        2013 Schedule C       | Amount claimed |
|------------------------------|----------------|
| Income                       |                |
| Gross receipts               | $10,000        |
| Returns and allowances       | (10,000)       |
| Gross income                 | 0              |
| Expenses                     |                |
| Car and truck expenses       | 38,000         |
| Depreciation                 | 1,775          |
| Insurance                    | 3,800          |
| Legal and professional services | 6,500       |
| Office expenses              | 1,380          |
| Rent or lease--vehicles, machinery, and equipment | 3,000 |
| Rent or lease--other business property | 1,128  |
| Repairs and maintenance      | 2,100          |
| Supplies                     | 3,900          |
| Travel                       | 12,000         |
| Deductible meals and entertainment | 14,000   |
| Total expenses               | 85,783[a]      |
| Net business income          | (85,783)       |

[a]The actual total of the expenses is $87,583, not $85,783 as Boneparte reported. This is probably due to a math error by Boneparte. Because we hold that he is not entitled to deduct any of the nonwagering business expenses that he reported on his return, his error does not affect our findings.

Boneparte duly copied the -$85,783 entry for net business income at the bottom of the Schedule C to line 12 of his Form 1040.

On line 21 of the Form 1040, Boneparte reported he earned "Gambling" income of $12,500. He reported adjusted gross income of $19,746.

[*23] On Schedule A, line 28, Boneparte claimed a $12,500 itemized deduction for "Gambling Income". On that Schedule A he also claimed an itemized deduction for $3,407 of real-estate taxes. Boneparte also claimed an itemized deduction for medical expenses. After reducing his medical expenses of $8,112 by 10% of his reported adjusted gross income (i.e., 10% × $19,746 = $1,975), he claimed a medical-expense deduction of $6,137.

Boneparte reported other items of income: $82,350 in wages, $10 in interest, $2,916 in taxable state tax refunds, and $10,753 in taxable pension distributions. Boneparte also claimed a $3,900 personal-exemption deduction.

He reported zero taxable income and zero tax (pre-credit). He reported a withholding credit of $8,290 for the 2013 tax year which has not been refunded to him.

Notice of deficiency for 2012

On August 29, 2014, the IRS issued Boneparte a notice of deficiency for the 2012 tax year. It determined a deficiency in tax of $21,090, an addition to tax under section 6651(a)(1) of $1,187, and a penalty under section 6662(a) of $4,218.

The notice of deficiency showed the following adjustments to the Schedule C: the $18,000 reported for "Gross receipts" was adjusted to zero; the $18,000 reported for "Returns and Allowances" was adjusted to zero; and every line item

[*24] for business expenses was adjusted from the amount reported to zero. Boneparte contests the disallowance of the line items for business expenses. See infra part 1 for the discussion of this issue.

The adjustments to the Schedule C increased Boneparte's adjusted gross income to $111,216. The increase in adjusted gross income in turn resulted in a computational reduction of Boneparte's medical-expense deduction from $10,634 to $3,951.

Additionally, the notice of deficiency disallowed, for lack of substantiation, the $3,592 real-estate tax deduction Boneparte had claimed on Schedule A. Boneparte contests this disallowance. See infra part 3 for the discussion of this issue.

As noted above, Boneparte reported $18,000 of gambling income on line 21 of Form 1040, which resulted in an $18,000 increase in his reported gross income. The notice of deficiency made no adjustment to the $18,000 of reported gambling income. Nor has the IRS since the notice of deficiency made any challenge to the $18,000 amount. Boneparte has not denied that the $18,000 amount he reported is correct. Thus, for the purpose of this case we accept that Boneparte's gross income for 2012 includes $18,000 in gambling income (if he is considered a casual gambler).

**[*25]**  The notice of deficiency disallowed the $18,000 itemized deduction that Boneparte claimed on his Schedule A for gambling losses.  Boneparte contests this disallowance.  See infra part 2 for the discussion of this issue.

As noted above, Boneparte reported $18,000 as "Gross receipts" on his Schedule C and an offsetting $18,000 as "Returns and Allowances".  The IRS did not take the position in the notice of deficiency that the $18,000 that Boneparte reported as gross receipts on his Schedule C is properly includable in his gross income as income from casual gambling (along with the $18,000 he reported on line 21 of his Form 1040).  Nor has it taken that position since it issued the notice of deficiency.  For his part, Boneparte does not concede that the $18,000 he reported as gross receipts on his Schedule C is includable in his gross income in addition to the $18,000 he reported as gambling income on line 21 of his Form 1040.

The notice of deficiency calculated Boneparte's taxable income as $98,656.

Notice of deficiency for 2013

On October 10, 2014, the IRS issued Boneparte a notice of deficiency for the 2013 tax year.  The IRS determined a deficiency in tax of $17,210 and additions to tax under sections 6651(a)(1) and (a)(2), and 6654 of $2,007, $268, and $144, respectively.

[*26]  The notice of deficiency stated that the $17,210 deficiency resulted from the following determinations:

- Boneparte failed to report $10,753 in IRA distributions.

- Boneparte failed to report $2,003 in state tax refunds.

- Boneparte failed to report $10 in interest income.

- Boneparte failed to report $82,350 in wages.

- Boneparte was entitled to a $3,900 personal-exemption deduction.

The notice of deficiency did not make any determination regarding Boneparte's reporting of gambling activity.  It calculated Boneparte's taxable income as $85,116.  It did not include in its calculation any profit or loss from a sole proprietorship (i.e., a business for which income and expenses are reported on a Schedule C), any gambling income, or any Schedule A deductions.

Further changes to IRS position since the notices of deficiency

Boneparte filed a timely petition in response to the notices of deficiency for 2012 and 2013.  He resided in New Jersey when he filed the petition.  The IRS answered.

Then, on June 11, 2015, the IRS wrote a letter to Boneparte stating that it had changed its position from that in the notice of deficiency for 2013 and that the new position was reflected in an examination report attached to the letter.  In its

[*27] posttrial brief, the IRS confirmed that the examination report reflects its position in this case with respect to the amount of the deficiency for 2013.

The examination report for 2013 stated that Boneparte had a deficiency of $15,835. This amount resulted from various adjustments to Boneparte's return shown in the examination report. The examination report stated that the IRS had disallowed the $85,783 business-expense deduction that Boneparte claimed on his Schedule C. Boneparte contests this adjustment. See infra part 1 for the discussion of this issue. The examination report stated that the $2,916 in income that Boneparte reported for state tax refunds should be reduced by $913; that is, from $2,916 to $2,003. Neither side contests that the correct amount is $2,003. Because of the adjustments described so far, Boneparte's adjusted gross income, as reflected in the examination report, became $104,616. This increase in Boneparte's adjusted gross income in turn resulted in a computational adjustment to his medical-expense deduction. The deduction was reduced from the $6,137 claimed to zero.

The examination report for 2013 made a "0.00"-dollar adjustment (i.e., no adjustment) to the $12,500 that Boneparte had claimed as an itemized deduction for gambling. The examination report stated no position and made no adjustment

**[\*28]** regarding the $12,500 in gambling income Boneparte reported on line 21 of his Form 1040.

The examination report for 2013 stated no position regarding the $10,000 in gross receipts that Boneparte reported on his Schedule C or the $10,000 in "Returns and Allowances" on the schedule. The examination report did not take the position that Boneparte was required to include the $10,000 in gross receipts in his gross income in addition to the $12,500 in gambling income that he reported on line 21 of his Form 1040. For his part, Boneparte does not concede that the $10,000 he reported as gross receipts on his Schedule C is includable in his gross income in addition to the $12,500 that he reported as gambling income on line 21 of his Form 1040.

The examination report made no adjustment to the $3,304 real-estate-tax deduction Boneparte claimed on Schedule A.

Unlike the notice of deficiency for 2013, the examination report did not find a deficiency based on (1) Boneparte's alleged failure to report $10,753 in taxable retirement distributions, $10 in interest, and $82,350 in wages, and (2) his entitlement to an unclaimed personal-exemption deduction. Because the IRS's litigating position is that the computations in the examination report are correct,

[*29] we conclude that the IRS has retracted these two determinations that had been reflected in the notice of deficiency for 2013.

The examination report calculated Boneparte's taxable income as $79,609. The examination report stated that Boneparte is liable for a section 6651(a)(1) addition to tax of $1,886 and a section 6662 penalty of $3,167 for 2013.

In its brief, the IRS states that its litigating position regarding the amount of the 2013 deficiency is reflected in the computations in the examination report. The IRS brief states that the IRS no longer asserts any additions to tax or penalties for 2013. This statement thus withdraws any assertion by the IRS for 2013 regarding the section 6651(a)(1) addition to tax (which was mentioned in the notice of deficiency and the examination report), the section 6651(a)(2) addition to tax (which was mentioned in the notice of deficiency), the section 6654 addition to tax (which was mentioned in the notice of deficiency), and the section 6662 penalty (which was mentioned in the notice of deficiency and the examination report).

The IRS's brief also takes the position that the $18,000 itemized deduction for gambling losses that Boneparte claimed for tax year 2012 should be allowed to the extent of $12,839. This is a concession compared with the notice of deficiency for 2012, which had determined that the amount of the deduction was zero.

**[*30]** Because of the changing positions of the IRS with respect to the amounts of the deficiencies, we summarize the IRS's positions with respect to the relevant line items of the returns in the following table:

**[\*31]**

| Year and item | Return | Def. notice | IRS's litigating position | Result |
|---|---|---|---|---|
| **2012** | | | | |
| Sch. C gross receipts | 18,000[a] | 0 | 0 | 0 |
| Sch. C returns & allow. | 18,000 | 0 | 0 | 0 |
| Sch. C bus. exp. | 89,116 | 0 | 0 | 0 |
| Gambling income line 21 | 18,000 | 18,000 | 18,000 | 18,000 |
| AGI | 22,100 | 111,216 | 111,216 | --[b] |
| Sch. A gambling deduct. | 18,000 | 0 | 12,839 | 18,000 |
| Sch. A real-estate taxes | 3,592 | 0 | 0 | 0 |
| Sch. A medical pre-7.5% | 12,292 | 12,292 | 12,292 | 12,292 |
| Sch. A medical post-7.5% | 10,634 | 3,951 | 3,951 | --[b] |
| Taxable income | 0 | 98,656 | Not computed | --[b] |
| Tax | 0 | 21,090 | Not computed | --[b] |
| | | | | |
| **2013** | | | | |
| Sch. C gross receipts | 10,000[a] | --- | 0 | 0 |
| Sch. C returns & allow. | 10,000 | --- | 0 | 0 |
| Sch. C bus. exp. | 85,783 | --- | 0 | 0 |
| Gambling income line 21 | 12,500 | --- | 12,500 | 12,500 |
| State tax refund income | 2,916 | 2,003 | 2,003 | 2,003 |
| AGI | 19,746 | 85,116 | 104,616 | ---[b] |
| Sch. A gambling deduct. | 12,500 | --- | 12,500 | 12,500 |
| Sch. A real-estate taxes | 3,407 | --- | 3,407 | 3,407 |
| Sch. A medical pre-10% | 8,112 | --- | 8,112 | 8,112 |
| Sch. A medical post-10% | 6,137 | --- | 0 | ---[b] |
| Taxable income | 0 | 85,116 | 79,609 | ---[b] |
| Tax | 0 | 17,210 | 15,835 | ---[b] |

[a]Neither party contends that the amounts reported as gross receipts on the Schedule C should be included in income in addition to the gambling income reported separately on the Form 1040.

[b]This is an amount that will be computed or recomputed under Rule 155.

[*32]  Five issues remain to be decided:  (1) whether Boneparte was a professional gambler and therefore entitled to nonwagering gambling expense deductions of $89,116 and $85,783 for 2012 and 2013, respectively, (2) whether he is entitled to an itemized deduction of $18,000 for losses from wagering transactions for 2012, (3) whether he is entitled to a $3,592 deduction for the payment of real-estate taxes for 2012, (4) whether he is liable for an addition to tax under section 6651(a)(1) for 2012, and (5) whether he is liable for an accuracy-related penalty under section 6662(a) for 2012.

OPINION

1.    Boneparte is not entitled to deduct the nonwagering expenses of gambling for 2012 or 2013.

The IRS disallowed the deductions Boneparte claimed on Schedule C for the nonwagering expenses of being a professional gambler (i.e., the expenses other than wagering costs).  These expenses, he reported, were $89,116 in 2012 and $85,783 in 2013.  Boneparte may deduct these expenses only if he is a professional gambler.  See infra part 1.j.

To be a professional gambler, the taxpayer must engage in gambling for profit.  Sec. 183(a), (b), and (c); sec. 1.183-2(a), Income Tax Regs.; Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).  Section 1.183-2(b), Income Tax Regs.,

[*33] provides nine factors to consider when determining whether an activity is engaged in for profit: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. See, e.g., Hendricks v. Commissioner, 32 F.3d 94, 98 (4th Cir. 1994), aff'g T.C Memo. 1993-396. These factors are not exclusive, and no one factor is dispositive. Sec. 1.183-2(b), Income Tax Regs.; Hendricks v. Commissioner, 32 F.3d at 98. As explained below, we find on a preponderance of evidence that Boneparte was not a professional gambler for the years 2012 and 2013.[5]

---

[5]In a prior case involving Boneparte's 2010 tax year, we held that Boneparte was not a professional gambler. Boneparte v. Commissioner, T.C. Memo. 2015-128, at *15. Because each tax year stands on its own, our opinion in the prior case does not control the outcome of this one.

**[*34]** a.   <u>Manner in which the taxpayer carries on the activity</u>

The manner in which the taxpayer carries on an activity may indicate a profit motive if the taxpayer acts in a "businesslike manner and maintains complete and accurate books and records", conducts the activity "in a manner substantially similar" to profitable activities of a similar nature, or attempts to improve the activity's profitability by adopting new operating methods and techniques and abandoning unprofitable methods. Sec. 1.183-2(b)(1), Income Tax Regs.

If a gambler kept detailed records of the gambling activity, that might support the gambler's argument that he or she had a profit motive. A gambler might keep records in order to test the success of a particular technique. Boneparte was not such a gambler. He did not keep any records other than the win/loss statements provided by the casinos. These statements generally state only the aggregate amount won or lost during the year at a particular casino. This factor weighs against Boneparte. See <u>Carmody v. Commissioner</u>, T.C. Memo. 2016-225, at *20-*23 (holding that taxpayer was not engaged in horse-racing activity for profit when he did not have a written business plan, did not use spreadsheets and invoices to minimize losses or generate profits, and did not engage in any meaningful financial management with respect to his horse-racing activity).

**[*35]** b.     The expertise of the taxpayer or his advisors

Preparation for an activity by extensive study of its accepted business, economic, and scientific practices, or consultation with industry experts, may indicate a profit motive where the taxpayer carries on the activity in accordance with such practices. Engdahl v. Commissioner, 72 T.C. 659, 668 (1979); sec. 1.183-2(b)(2), Income Tax Regs. Efforts to gain experience and a willingness to follow expert advice may also indicate a profit motive. Dworshak v. Commissioner, T.C. Memo. 2004-249, slip op. at 10-11.

Boneparte testified that he spent time with a friend who also gambled frequently. He testified that this friend helped him learn about gambling but that they also "went [all] over and partied". Boneparte also testified that he purchased books and videos on how to win playing slot machines and baccarat.

Boneparte's testimony is credible. However, the mere fact that Boneparte tried to learn how to win at slot machines and baccarat does not necessarily suggest that he played these games in order to make a profit. It is also consistent with playing the games for recreation or, alternatively, trying to limit his losses. We are not persuaded that Boneparte's consultations with his friend or his buying books and videos showed that he intended to have net gains. This factor weighs against Boneparte.

**[\*36]** c.    <u>The time and effort expended by the taxpayer in carrying on the activity</u>

The time and effort devoted to an activity may indicate a profit motive, particularly if the activity does not include substantial recreational aspects. Sec. 1.183-2(b)(3), Income Tax Regs. A taxpayer's withdrawal from another occupation to devote most of his or her energies to the activity may be evidence that the activity is engaged in for profit. <u>Id.</u>

Boneparte's primary activity was working full-time as a "tunnel bridge agent" with the Port Authority. Although he gambled frequently, he gambled only in his spare time. Furthermore, he derived a recreational benefit from his gambling activity. This is why he continued to gamble despite the lack of profit. This factor weighs against Boneparte.

d.    <u>Expectation that assets used in activity may appreciate in value</u>

This factor is neutral and is not applicable in this case, as Boneparte's gambling does not involve holding assets.

e.    <u>The success of the taxpayer in carrying on other similar or dissimilar activities</u>

Previous experience in similar activities and successful conversion of unprofitable to profitable enterprises may indicate a profit motive. <u>Id.</u> subpara. (5).

**[\*37]** Boneparte has no history of success with business activities besides working as a "tunnel bridge agent". Working as a tunnel bridge agent is not necessarily helpful in preparing someone for a successful career as a gambler. This factor weighs against Boneparte.

f. The taxpayer's history of income or losses with respect to the activity

A series of years of net income would be a strong indication that the activity is engaged in for profit. Id. subpara. (6). Year after year of losses, however, may indicate a lack of profit motive. Id.

Boneparte has a history of gambling losses. Nothing in the record indicates that he has ever profited from gambling. Boneparte did not make a profit in 2009, 2010, 2011, 2012, or 2013. He had net wagering losses of $14,887 in 2012 and $12,609 in 2013. Boneparte's history of sustained losses is indicative of a lack of profit objective. This factor weighs against Boneparte.

g. The amount of occasional profits, if any, which are earned

The amount of profits earned in relation to the amount of losses incurred and the amount of the investment may indicate a profit motive. Id. subpara. (7). Earning of substantial profits, even if the profits are sporadic, generally indicates a profit motive if the taxpayer's investment or losses are relatively small. Id. The mere opportunity to earn a substantial profit may also indicate a profit motive. Id.

**[*38]** In contrast, an occasional small profit generally indicates a lack of profit motive if the taxpayer's investment or losses are relatively large. Id.

The record shows Boneparte lost money gambling over several years and did not earn even sporadic profits. This factor weighs against Boneparte.

h.    The financial status of the taxpayer

Having substantial income from other sources may indicate that the activity in question is not engaged in for profit, especially where losses from the activity generate substantial tax benefits or where there are recreational elements involved. Id. subpara. (8).

Boneparte earned $78,000 as an employee of the Port Authority during 2012, and $82,000 as an employee of the Port Authority during 2013. This is substantial income from another source. If he is permitted to deduct his gambling-related expenses from his Port Authority income, his taxable income will be significantly reduced. The combined recreational nature of gambling and the substantial tax benefit he would gain from being permitted to deduct his gambling-related expenses weigh against a profit motive. See Moore v. Commissioner, T.C. Memo. 2011-173 (holding that taxpayer's financial status did not indicate profit motive when he derived bulk of income from employment outside of gambling). This factor weighs against Boneparte.

**[\*39]** i.    Elements of personal pleasure or recreation

The presence of personal or recreational elements in an activity may indicate the absence of a profit motive.  Sec. 1.183-2(b)(9), Income Tax Regs. The mere presence of a personal or recreational aspect, however, does not necessarily preclude a profit motive.  Id.

Boneparte's gambling involved elements of personal pleasure and recreation.  He testified that he traveled and "partied" with a friend in conjunction with his gambling.  This factor weighs against Boneparte.

j.    Conclusion:  Weighing the factors

None of the factors weighs in favor of the finding of a profit motive, and all relevant factors weigh against the finding of a profit motive.  We conclude on a preponderance of evidence that Boneparte did not engage in his gambling activity for profit.  This conclusion, combined with the conclusions in other portions of this opinion, means that Boneparte cannot deduct his nonwagering expenses of gambling.  More specifically, for 2012:

- Boneparte's gross income from gambling is $18,000.  See supra p. 23.

- Boneparte is entitled to a section 165(d) deduction of $18,000.  See infra part 2.

[*40] ● Boneparte's section 183(b)(1) deduction is $18,000, identical to his section 165(d) deduction.

● Therefore, his section 183(b)(2) deduction is limited to the gross income derived from gambling, $18,000, minus the section 183(b)(1) deduction, $18,000, which is zero.

● No further deduction for gambling expenses is allowed. See sec. 183(a).

And for 2013:

● Boneparte's gross income from gambling is $12,500. See supra pp. 26-27.

● Boneparte is entitled to a section 165(d) deduction of $12,500. See supra pp. 26-27.

● Boneparte's section 183(b)(1) deduction is $12,500, identical to his section 165(d) deduction.

● Therefore, his section 183(b)(2) deduction is limited to the gross income derived from gambling, $12,500, minus the section 183(b)(1) deduction, $12,500, which is zero.

● No further deduction for gambling expenses is allowed. See sec. 183(a).

**[*41]** 2.    Boneparte is entitled to an $18,000 wagering-loss deduction for 2012.[6]

A taxpayer who is not in the trade or business of gambling deducts losses from wagering transactions as an itemized deduction, but only to the extent of gains from wagering transactions.  Sec. 165(d); sec. 1.165-10, Income Tax Regs.; see also Norgaard v. Commissioner, 939 F.2d 874, 878 (9th Cir. 1991), aff'g in part, rev'g in part on other grounds T.C. Memo. 1989-390; Briseno v. Commissioner, T.C. Memo. 2009-67.

On his 2012 tax return, Boneparte reported losses from wagering transactions of $18,000 as an itemized deduction on his Schedule A and gains from wagering transactions of $18,000 on line 21 of his Form 1040.  The IRS's position is that Boneparte should include the $18,000 of gains in his gross income, but that the itemized deduction should be only $12,839.

Recall that the record contains statements from 14 casinos regarding Boneparte's wagering activity for the year 2012.  We found that the statements showed an aggregate loss from wagering activity for the year of $14,887.  We rejected the IRS's interpretation of one of the statements, under which the

_____

[6]We need not determine the correctness of the itemized deduction that Boneparte claimed for losses from wagering transactions for 2013 because the IRS did not disallow the deduction for that year.

**[*42]** aggregate losses would have been $12,839. This is how it arrived at its position that the itemized deduction should be $12,839.

In formulating its position that Boneparte's itemized wagering-loss deduction for 2012 was only $12,839, the IRS relied entirely on the statements from the 14 casinos. The IRS does not allege that Boneparte gambled at casinos other than those 14. Neither does Boneparte. We therefore accept as true the proposition that the 14 casino statements reflect all of Boneparte's wagering activities in 2012. This proposition helps us determine the amount of Boneparte's losses from wagering transactions.

Boneparte's wagering transactions for the year fall into two groups: those for which there was a gain and those for which there was a loss. As we explained at the beginning of the opinion, a casual gambler's gross income includes the gains from wagering transactions for which there was a gain. This amount is also the gain from wagering transactions within the meaning of section 165(d). The parties have agreed that the correct inclusion in Boneparte's gross income is $18,000. This is the amount Boneparte reported on his return, and the IRS did not adjust it. Thus, the parties have agreed that Boneparte's gains from his wagering transactions for which there were gains for 2012 equal $18,000. The 14 casino statements include the amounts of both (1) gains from wagering transactions for

[*43] which there was a gain and (2) losses from wagering transactions for which there was a loss. Therefore the aggregate loss from all 14 statements, -$14,887, equals the gains from wagering transactions for which there is a gain minus the losses from wagering transactions for which there was a loss. It is not, as the IRS assumes, just the losses from wagering transactions for which there was a loss.

As explained above, two propositions are true: (1) the gains from wagering transactions for which there was gain total $18,000, and (2) the gains from wagering transactions for which there was a gain minus the losses from wagering transactions for which there was a loss equal -$14,887. It mathematically follows from these two propositions that the losses from wagering transactions for which there is a loss equal -$32,887 (i.e., $18,000 – $32,887 = -$14,887). Boneparte is entitled to a section 165(d) deduction equal to this amount to the extent of gains from wagering transactions. This gain is $18,000. Therefore his section 165(d) deduction is $18,000.

We hold that Boneparte is entitled to a Schedule A deduction of $18,000 for wagering losses for the 2012 year.

3. <u>Is Boneparte entitled to a deduction of $3,592 for real-estate taxes for 2012?</u>

Boneparte claimed a deduction of $3,592 for real-estate taxes for the 2012 tax year. The IRS disallowed this deduction in the notice of deficiency for the

**[\*44]** 2012 tax year. On brief, the IRS contends that Boneparte failed to substantiate these expenses. Boneparte did not address these expenses at trial or in his opening posttrial brief. In his answering posttrial brief, Boneparte finally said this about the expenses:

> Schedule a deduction for real estate taxes, $3,592. Superstorm Sandy destroyed a lot of my actual receipts as they became water-logged. I also informed Respondent that my younger sister married and moved from South Carolina to Arkansas. I paid her $900 a month for the mortgage and $1200 in property tax for six months while she relocated and found new employment. I dropped the real estate tax and will charge it as N.O.L. later.

We understand the above statement to be a concession by Boneparte that he is not entitled to the deduction. Accordingly, we sustain the IRS's determination that Boneparte is not entitled to a deduction in any amount for real-estate taxes for the 2012 tax year.

4.    Is Boneparte liable for an addition to tax under section 6651(a)(1) for 2012?

The IRS determined that Boneparte is liable for the section 6651(a)(1) addition to tax for the 2012 tax year. Section 6651(a)(1) imposes an addition to tax for failure to file a tax return by its filing deadline (determined by taking into account any extensions of that deadline) unless the taxpayer can establish that the failure to file is due to reasonable cause and not due to willful neglect. The section 6651(a)(1) addition to tax is 5% of the amount required to be shown as tax

[*45] on the return for each month the failure to file continues, not to exceed 25% in the aggregate. Sec. 6651(a)(1), (b)(1). The IRS determined an addition to tax corresponding to Boneparte's return being more than one month late. Therefore it determined that he is liable for an amount equal to 5% of the amount required to be shown as tax for the failure to file the return by April 15, 2013, and another 5% for the failure to file the return by May 15, 2013.

The IRS bears the burden of production for additions to tax determined under section 6651(a)(1). See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). The IRS satisfies its burden by producing sufficient evidence to establish that the taxpayer failed to timely file a required federal-income-tax return. See Wheeler v. Commissioner, 127 T.C. 200, 207-208 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008); Higbee v. Commissioner, 116 T.C. at 447. Once the IRS has satisfied its burden of production, the taxpayer has the burden of proving that the return was not late, or if it was filed late, that the lateness was due to reasonable cause and not willful neglect. See Higbee v. Commissioner, 116 T.C. at 447.

Boneparte's tax return for 2012 was due on April 15, 2013. See sec. 6072(a). The IRS produced the envelope that Boneparte used to mail the return. The date on the envelope was June 7, 2013. The IRS also produced the return

[*46] itself from its files. The face of the return has an IRS received stamp of June 7, 2013. Boneparte did not testify as to when he filed the return. Boneparte argues on brief that he had an incentive to file his 2012 return on time: He wanted to obtain a tax refund. He also argues on brief that an IRS date stamp is "unacceptable" proof of the date he mailed the return.

We hold that the date on the return's envelope and the IRS's date stamp satisfy the IRS's burden of producing evidence that Boneparte mailed his return late. And we find Boneparte has not proven the return was timely.[7] We sustain the addition to tax under section 6651(a)(1).

5.  Is Boneparte liable for an accuracy-related penalty under section 6662(a) for 2012?

The IRS determined that Boneparte is liable for the section 6662(a) accuracy-related penalty for the 2012 tax year. Section 6662(a) imposes a 20% penalty on any portion of an underpayment of tax that is attributable to any of the causes listed in section 6662(b). These causes include "[a]ny substantial

---

[7]We have no ready explanation for how the return could be mailed by Boneparte on the same day it was received by the IRS. Boneparte mailed the return from New Jersey. It arrived at an IRS office in Kansas City, Missouri. It is unlikely that the return could be sent and received the same day. This suggests some error in either the date on the envelope or the IRS's date stamp. However, this suggestion does not cause us to find that Boneparte's return was filed on or before May 15, 2013. This is what he has to prove to show that the IRS's penalty computation is incorrect.

**[\*47]** understatement of income tax" and "[n]egligence or disregard of rules or regulations". Sec. 6662(b)(1) and (2).

In general, an understatement of income tax is the correct amount of tax minus the tax actually shown on the return. Sec. 6662(d)(2)(A). An understatement of income tax is substantial if (1) the understatement exceeds 10% of the correct tax and (2) the understatement exceeds $5,000. Sec. 6662(d)(1)(A); sec. 1.6662-4(b)(1), Income Tax Regs. An understatement is reduced, however, by the portion attributable to the treatment of an item for which the taxpayer had "substantial authority". Sec. 6662(d)(2)(B)(i).

Computations by the parties under Rule 155 will confirm whether there was a substantial understatement of income tax on Boneparte's 2012 return. Boneparte does not argue he had "substantial authority" for any part of the understatement. Nor are we aware any of substantial authority for any part of the understatement. So no reduction will be made for the "substantial authority" exception.

Regardless of whether Boneparte's underpayment for the 2012 tax year is due to a substantial understatement of income tax, we hold that it is due to negligence. Negligence includes any failure to make a reasonable attempt to comply with the tax laws. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence is strongly indicated where a taxpayer fails to make a reasonable

**[*48]** attempt to determine the correctness of a deduction, credit, or exclusion that would seem to a reasonable person to be "too good to be true". Sec. 1.6662-3(b)(1)(ii), Income Tax Regs. Negligence also includes a failure to maintain accurate records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs. Boneparte was not, in our view, a professional gambler. Many factors point to the fact that he was not one. Boneparte's trips to Atlantic City were therefore personal trips. The expenses of these trips were personal expenses. He should have realized it was too good to be true that he could avoid taxation on his Port Authority wages by making pleasure trips to Atlantic City. Furthermore, he failed to provide any evidence to substantiate his real-estate-tax payments.

Once the IRS has met its burden of producing evidence that a taxpayer is liable for a penalty, the taxpayer bears the burden of proving that the penalty is inappropriate because, for example, the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1) (providing that the penalty under section 6662(a) does not apply to any portion of the underpayment to the extent that the taxpayer had reasonable cause for that portion of the underpayment, and acted in good faith with respect to that portion); Higbee v. Commissioner, 116 T.C. at 447. The existence of reasonable cause and good faith is determined on a case-by-case

**[*49]** basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The regulations provide the following guidance:

> Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all facts and circumstances, including the experience, knowledge, and education of the taxpayer.

Id. Boneparte does not assert that he had reasonable cause for the underpayment or that he acted in good faith with respect the underpayment. He did not hire a tax-return preparer to prepare his 2012 tax return. He testified that he made the decision to file his returns as a professional gambler starting with the 2009 tax year. However, he did not explain what steps he took to ascertain that this reporting treatment was correct under the tax law. Nor is there evidence of how he arrived at his decision to deduct real-estate taxes on the 2012 return. We conclude that Boneparte did not have reasonable cause for the underpayment and did not act in good faith with respect the underpayment.

We hold that Boneparte is liable for the accuracy-related penalty under section 6662(a) for 2012.

**[\*50]**  In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.